# United States Court of Appeals
## For the First Circuit

No. 15-1763

UNITED STATES OF AMERICA,

Appellee,

v.

MANUEL ACEVEDO-HERNÁNDEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Torruella, Lipez, and Barron,
Circuit Judges.

Lydia Lizarríbar-Masini, for appellant.
Scott A.C. Meisler, Criminal Division, Appellate Section,
U.S. Department of Justice, with whom Kenneth A. Blanco, Acting
Assistant Attorney General, Trevor N. McFadden, Acting Principal
Deputy Assistant Attorney General, Rosa Emilia Rodríguez-Vélez,
United States Attorney, Timothy R. Henwood, Assistant United
States Attorney, and José Capó-Iriarte, Assistant United States
Attorney, were on brief, for appellee.

August 6, 2018

**TORRUELLA**, **Circuit Judge**. After a jury trial, Defendant-Appellant Manuel Acevedo-Hernández ("Acevedo"), a former Puerto Rico Superior Court Judge, was convicted of participating in a conspiracy to bribe an agent of an organization receiving federal funds, in violation of 18 U.S.C. § 371 (Count One), and of receiving a bribe, in violation of 18 U.S.C. § 666(a)(1)(B) (Count Three). He appeals his conviction and sentence, citing a number of alleged trial and sentencing errors. After carefully reviewing his claims, we affirm.

## I. Background[1]

### A. Factual Background

Acevedo was a Puerto Rico Superior Court Judge in the Aguadilla judicial region of Puerto Rico. In 2012, he was assigned to preside over the criminal case brought against Lutgardo Acevedo-López ("Lutgardo"),[2] an accountant and attorney charged with aggravated negligent homicide, obstruction of justice, and driving under the influence of alcohol ("DUI"). Lutgardo's charges stemmed from a car accident that took place on June 30, 2012, in

---

[1] We summarize the relevant facts, reserving for our analysis a more detailed discussion of the facts relevant to each issue presented on appeal.

[2] Because several individuals mentioned in this opinion have the last name "Acevedo," we refer to them by either their first name or a nickname used in the record. We mean no disrespect.

which Lutgardo's BMW crossed into the opposite lane, and collided with Félix Babilonia's ("Babilonia") vehicle, killing him.

Lutgardo wanted to be acquitted from the state criminal charges, among other obvious reasons, so that he could be eligible to enter into business contracts with the government. To further his goal, Lutgardo enlisted the help of his friend of fifteen years, Ángel Román-Badillo ("Lito"). Lito owned a restaurant and a bar, and also worked as a facilitator (or "gestor" in Spanish).[3] Lutgardo trusted Lito, who had done things for him in the past, including buying drugs for him so that Lutgardo did not have to go to "drug points" himself. Lito had known Acevedo for more than a decade, and was a neighbor to Acevedo's brother, Saúl Acevedo-Hernández ("Saúl"). Lito also stood to benefit from Lutgardo's acquittal because Lito would participate in the government contracts Lutgardo hoped to receive.

Lutgardo, who knew that the criminal case against him would be assigned to Acevedo, believed that "everybody had a price" and thus instructed Lito to find out what Acevedo's price was. Through Saúl, Lito coordinated a meeting with Acevedo at Rompe Olas Restaurant in Aguadilla, Puerto Rico. Saúl, Lito, Acevedo, and Acevedo's nephew, Miguel Acevedo ("Miguel") attended that

---

[3] Lito's bar was located across from Lutgardo's accounting office.

-3-

meeting, which took place in November 2012. The attendees discussed Lutgardo's criminal case. Lito informed Acevedo that the case would be assigned to him. Acevedo responded that he would inform Lito if the case was indeed assigned to him, and Lito and Acevedo exchanged phone numbers. When Acevedo was in fact assigned to preside over Lutgardo's case, he notified Lito.

Although Acevedo initially mentioned that Lutgardo's case was so delicate that it "could not be worked on, not even for $100,000," he eventually agreed to provide Lutgardo with favorable treatment, including, crucially, acquitting him from the criminal charges. Acevedo told Lito that, in exchange for his participation in the scheme, he wanted a state appellate judgeship -- which had a higher salary than the position he then held -- as well as jobs for his brother Saúl at the Puerto Rico Treasury Department, and for his nephew Miguel at the Puerto Rico State Insurance Fund Corporation. Acevedo was "practically supporting" Saúl and Miguel, so he wanted to be relieved from the financial burden they represented. Accordingly, Acevedo provided Lito with his resume along with those of Saúl and Miguel, which Lito then forwarded to Lutgardo.

Lutgardo deposited $30,000 into Lito's personal bank account to pay for expenses related to the scheme. After the November 2012 meeting, and until April 2013, Lito and Acevedo

-4-

talked on a daily basis and went out practically every Wednesday through Sunday to bars and restaurants. They spent $200-$300 per outing. All expenses were paid by Lito, using money provided by Lutgardo.

Lutgardo planned to use his good childhood friend, Anaudi Hernández-Pérez ("Anaudi"), to help Acevedo obtain his desired position through a recess appointment[4] to the Puerto Rico Court of Appeals. Anaudi was a businessman and fundraiser for the political party that had just won the governorship. He had strong ties with the then-governor elect, Alejandro García-Padilla ("García-Padilla"), maintained good relationships with many other politicians, and had previously assisted another candidate in his reappointment to an additional term in the judiciary. Lutgardo's brother, Bebe,[5] told Anaudi that Acevedo had been assigned to preside over Lutgardo's case and asked him to help Acevedo get his desired promotion.

---

[4]  In Puerto Rico, ordinarily, state appellate judges are nominated by the governor and then confirmed by the Senate. However, if the governor appoints a candidate while the Senate is in recess -- known as a recess appointment -- that nominee sits as an appellate judge until the Senate reconvenes. If the judge were to retire in the interim, he would still retire as an appellate judge.

[5]  Because Lutgardo and his brother share the same name, Lutgardo Acevedo, we refer to Lutgardo's brother by his nickname, "Bebe."

Anaudi had organized a golf tournament for December 30, 2012, in Aguadilla, where the then-governor elect García-Padilla and other high-ranking politicians for the incoming political party would be in attendance.[6]  On December 29, Lutgardo instructed Lito to take Acevedo to the golf tournament so that Acevedo could meet García-Padilla and confirm that Lutgardo had the political connections to deliver the appellate judgeship that Acevedo wanted.  The next day, Lito picked up Acevedo at his house, took him for breakfast -- during the course of which Lito explained to Acevedo that García-Padilla and other high-ranking politicians would be at the golf tournament -- and then drove him to the tournament.  When they got to the tournament, Acevedo refused to get out of the car because he "was nervous" to be seen with Lutgardo's acquaintances, but told Lito that "there was no doubt that there was power" to make good on the judgeship offer.  At some point that day, Anaudi asked Bebe, who was also at the golf tournament, why Acevedo had not yet arrived.  Bebe responded that Acevedo did not get out of the car because, as the judge presiding over Lutgardo's case, he was nervous about being seen.

Around three weeks later, on January 21, 2013, Lito drove Acevedo to Anaudi's house in Aguadilla to meet Anaudi and "come to

---

[6]  García-Padilla's swearing-in ceremony was held three days later, on January 2, 2013.

-6-

an agreement" as to how Acevedo would be promoted to the Court of Appeals.  During the meeting, Acevedo told Anaudi that he had been a trial judge for twenty-eight to thirty years and that his dream was to retire as an appellate judge.  He requested Anaudi's help in getting promoted, as well as in getting government employment for Saúl and Miguel.  They also talked about Lutgardo's pending criminal case, and Anaudi referred to Lutgardo as his "special friend."

To keep Acevedo happy, between January and February 2013, Lito, on behalf of Lutgardo, made two payments totaling over $3,200 towards Acevedo's income tax debt with the Treasury Department.  Lito also gave Acevedo watches and ball-point pens, and paid for the supplies, labor and other costs associated with the remodeling of Acevedo's garage, bedroom, and bathroom. Lutgardo provided the money to cover these expenses.

Honoring his role in the scheme, from January through March 2013, Acevedo provided strategic legal advice in Lutgardo's criminal case.  Lito functioned as the middleman between Acevedo and Lutgardo.  Lito and Lutgardo constantly spoke about what Lutgardo wanted to inquire from Acevedo.  Lito then relayed any information given by Acevedo to Lutgardo and his defense counsel, attorneys Mayra López-Mulero and Harry Padilla. Acevedo instructed Lito regarding what motions defense counsel should file, when to

file them, and how Acevedo would rule on the issues. He also reviewed draft motions and pleadings prepared by Lutgardo's defense counsel. Acevedo suggested edits and discussed them with Lito, who then shared Acevedo's feedback with Lutgardo's defense counsel before they filed the corrected motion or pleading. For example, in January 2013, Acevedo suggested that Lutgardo file a motion for the state to return him his BMW, and then to have an expert examine it. Following Acevedo's advice, Lutgardo's defense counsel filed the motion, which Acevedo then granted. Additionally, Lutgardo provided a diagram of the accident to Lito and instructed him to discuss it with Acevedo. Following Lutgardo's instruction, Lito discussed the diagram -- described as an important piece of the trial strategy -- with Acevedo, who then said that he needed to visit the site of the accident just "to be clear." Accordingly, Lito and Acevedo made two ex parte visits to the site of the accident while the case was pending.

On March 22, 2013 -- three days before the trial started -- Acevedo told Lito that Lutgardo's defense counsel should use phone records to effectively cross-examine the government's eye witnesses to the auto collision in order to show that they were distracted on the phone while the collision occurred and thus make them look unreliable. Lito, in turn, relayed this advice to

Lutgardo.  Lito and Acevedo also joked that Lutgardo must have been in urgent need of Imodium.[7]

The next day, Lito and Acevedo went to the home of Lito's aunt in Guánica, Puerto Rico, to buy a red motorcycle for Acevedo.[8] Lito paid $1,200 for Acevedo's motorcycle with money provided by Lutgardo.[9]

The following day, on the eve of the trial, Lito hosted a barbecue at his house where he and Acevedo discussed Lutgardo's case.  At some point, Lutgardo called Lito on his cell phone to ask "how was everything going," and Acevedo mentioned that Lutgardo "should remain calm and not be such a prick."

Lutgardo's trial began on Monday March 25, 2013, during Holy Week.[10]  As part of the strategy, Acevedo had purposely scheduled the trial -- which would not last more than three days -- during Holy Week because people would be distracted with other matters going on that week and thus would not pay too much

---

[7]  Imodium is a common over-the-counter remedy for diarrhea.

[8]  Lito also bought two other motorcycles for himself.

[9]  They stored Acevedo's motorcycle at Lito's house.  The plan was for Acevedo to get it once the trial had ended, but Acevedo never took possession of the motorcycle because of the events that took place on April 5, which will be explained shortly.

[10]  Holy Week in Christianity is the week before Easter, beginning with Palm Sunday and ending on Holy Saturday, the day before Easter Sunday.

attention to the trial. Although Lutgardo knew all along that he was going to have a bench trial, in order to avoid raising suspicions, he waited until the first day of trial to waive his right to a jury trial. Both Lutgardo and Acevedo instructed Lito not to attend the trial because Lito had been seen socializing with Acevedo so frequently that both of them thought it would be troublesome for Lito to be seen at the trial. Instead, Lutgardo had his cousin and driver, Rafael Lorenzo-López ("Lorenzo") attend the trial. During court recesses, Acevedo communicated with Lito to let him know "how everything was going" and to inform him whether defense counsel "need[ed] to change anything." Lito passed along this information to Lorenzo, who in turn shared it with either Lutgardo or his defense counsel. Acevedo also granted Lutgardo's motion to preclude the prosecution from calling any rebuttal witnesses. On March 27, 2013, Acevedo acquitted Lutgardo of all criminal charges pending against him. Acevedo then spoke with Lito to inform him that he had just acquitted Lutgardo and to tell him that he should look at the newscast. The next day, Lutgardo had Lorenzo deliver to Lito a $25,000 check for reimbursement of expenses that Lito had spent on Acevedo. One week later, Lutgardo sent Lito a second check for $25,000, also for reimbursement of expenses related to the scheme.

On April 5, 2013, Lito rented a Hyundai Sonata at Budget Car Rental in Aguadilla and, per Acevedo's request, drove Acevedo to a seminar for judges at the Court of Appeals in San Juan. While Acevedo was at the seminar, Lito went to the Macy's store located at Plaza Las Américas shopping mall and bought cufflinks, ties, tie clips, and shirts for Acevedo. Lito then returned to the Court of Appeals to pick up Acevedo from the seminar. Afterwards, they stopped at a place near the Court of Appeals to have "a couple of drinks," before heading back to Aguadilla. On their way to Aguadilla, they stopped at another establishment in which they had more drinks, ate, and danced for a while. Lito and Acevedo then left the establishment and hit the road, drinks in hand.

Police officers eventually pulled Lito's rental car over for speeding. One of the officers, Elvis Soto, saw Acevedo and immediately recognized him. Officer Soto also "perceiv[ed] a strong smell of alcohol" and noticed that Lito's eyes were reddish. Accordingly, he informed Lito that there was a DUI checkpoint farther ahead, and that he needed to take Lito there to perform a breathalyzer test. Acevedo tried to intervene on Lito's behalf, attempting to keep Lito from facing criminal charges. Another officer drove Lito's rental car to the DUI checkpoint, which was close by. Several police officers who had been involved in Lutgardo's case were at the DUI checkpoint and, upon learning that

Lito was accompanied by Acevedo, immediately associated Lito with Lutgardo and commented that they now knew "what happened in the trial."

The media made the incident public, which revived public concerns over the integrity of Lutgardo's trial. Thereafter, Lito gave Acevedo $3,000 or $4,000 in cash so that Acevedo could hire an attorney and "prepare [himself] for whatever c[ould] come forward." The two of them then stopped communicating.

Months later, Lutgardo and Lito created a backdated contract to conceal and provide a false explanation for the money that Lutgardo had given Lito to pay Acevedo or otherwise use in furtherance of the scheme. They intended for it to appear as if the money had been for a legitimate investment by Lutgardo in Lito's bar business in 2013.

In December 2013, Lito began cooperating with the Federal Bureau of Investigations ("FBI"). As part of his cooperation, Lito contacted Acevedo and secretly recorded a conversation between the two of them. In this conversation, Acevedo rued the day he was assigned to preside over "[t]he fucking case," talked about the red motorcycle that Lito had bought for him, and lamented that Anaudi had not delivered the appellate judgeship position, and that Officer Soto had "screwed" them. Lito also secretly recorded a conversation he had with Lutgardo.

On April 14, 2014, FBI agents executed a search warrant on Acevedo's house and interviewed Acevedo.[11] The agents asked Acevedo whether he had received anything of value from Lutgardo, Lito, or anyone associated with Lutgardo, and whether he had ever been to Anaudi's house in Aguadilla, all to which Acevedo responded in the negative. When the agents told Acevedo that they had information that Lito had given him a watch, Acevedo gave conflicting stories. He initially denied having received a watch, but then admitted to having received one from Lito. Acevedo also claimed that he destroyed the watch and threw it into the ocean. He then changed his story and said he gave the watch to a relative. When the agents then showed Acevedo the cufflinks and two watches that they had seized from Acevedo's nightstand tables, Acevedo became "really nervous" and his demeanor changed. Acevedo eventually admitted that Lito drove him to Anaudi's house to deliver his resume, as well as the resumes of two relatives.

## B. Procedural Background

On May 28, 2014, a grand jury returned an indictment charging Acevedo with conspiracy to bribe an agent of an organization receiving federal funds, in violation of 18 U.S.C. § 371 (Count One), and receipt of a bribe by an agent of an

_____

[11] Acevedo was advised of his rights, which he voluntarily waived.

-13-

organization receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B) (Count Three).[12]

Acevedo's jury trial began on January 9, 2015. The government called nineteen witnesses during its case-in-chief, including Lito -- its main witness -- and Miriam Rodríguez -- Babilonia's mother-in-law -- who briefly testified on the second day of trial. At the close of the government's case, Acevedo moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, which the district court denied. Acevedo subpoenaed Lutgardo to testify, but Lutgardo invoked his Fifth Amendment right against self-incrimination. After a hearing outside of the presence of the jury to discuss Lutgardo's assertion of his Fifth Amendment right, the district court upheld Lutgardo's assertion of that right. After presenting his witnesses, Acevedo renewed his motion for acquittal, which the court again denied.

---

[12] Lutgardo was also charged in Count One of the indictment, as well as with paying a bribe to an agent of an organization receiving federal funds, in violation of 18 U.S.C. § 666(a)(2). He pled guilty to both counts and was sentenced to nine years of imprisonment. We affirmed his sentence. See United States v. Acevedo-López, 873 F.3d 330 (1st Cir. 2017).

Lito waived indictment and pled guilty to a two-count information charging him with conspiracy to bribe an agent of an organization receiving federal funds, in violation of 18 U.S.C. § 371, and paying a bribe to an agent of an organization receiving federal funds in violation of 18 U.S.C. § 666(a)(2). See Cr. No. 14-368 (ADC), ECF Nos. 1-3. He is awaiting sentencing in the U.S. District Court for the District of Puerto Rico.

On January 20, 2015, after a seven-day trial, the jury found Acevedo guilty of both counts.

At sentencing, the district court rejected Acevedo's objections to two sentencing enhancements. First, the court rejected Acevedo's contention that all payments made to him constituted a single incident of bribery. Accordingly, the court applied the two-level enhancement provided in U.S. Sentencing Guidelines ("U.S.S.G.") § 2C1.1(b)(1) for offenses involving more than one bribe. Second, the district court determined that "the value of the payment and the benefit received or to be received or the value of anything obtained" by Acevedo exceeded $120,000, which triggered a ten-level enhancement pursuant to U.S.S.G. § 2C1.1(b)(2).[13] When these contested enhancements -- as well as the uncontested four-level enhancement under U.S.S.G. § 2C1.1(b)(3) for being a public official in a sensitive position -- were added to the base offense level of fourteen pursuant to U.S.S.G. § 2C1.1(a)(1), the total offense level resulted in thirty. This, in conjunction with Acevedo's criminal history category of I, yielded an advisory guidelines sentencing range ("GSR") of sixty months of imprisonment for Count One and 97-120 months of imprisonment for Count Three.[14] The government requested that

---

[13] The court determined that the value was at least $155,780.

[14] The GSR for Count Three was 97-121 months of imprisonment, but

-15-

Acevedo be sentenced to a total of 120 months' imprisonment, while Acevedo asked for a sentence of time served or "house incarceration or . . . probation for a term of years."  Acevedo was ultimately sentenced to sixty months of imprisonment for Count One and 120 months for Count Three, to be served concurrently.  The court also imposed three years of supervised release for each count, to be served concurrently after his release from prison.  Acevedo timely appealed.

## II.  Discussion

### A.  Sufficiency of the Evidence

Acevedo challenges the sufficiency of the evidence supporting his convictions.  Regarding Count One, Acevedo argues that the district court erred in denying his motion for acquittal because the evidence was insufficient to prove that he knowingly and voluntarily participated in the conspiracy.  Specifically, Acevedo argues that Lito "controlled and orchestrated every move" to advance his own interest in obtaining money from Lutgardo, and that Acevedo never shared Lito's knowledge of the underlying criminal act.  According to Acevedo, the evidence presented at trial proved a conspiracy between Lito and Lutgardo, but failed to

_____

his GSR was capped at 120 months under U.S.S.G. § 5G1.2(b) because the statutory maximum for the count of conviction was ten years. See 18 U.S.C. § 666(a).

-16-

show that Acevedo "saw, heard, met or discussed anything with codefendant Lutgardo," which, he says, shows that he was not a knowing participant in the conspiracy. Acevedo further claims that he never asked for money or anything of value; that the "alleged watches, cufflinks and [items] that [Lito] testified he bought for [Acevedo] were gifts"; and that he never applied for the appellate judge position.

Regarding his conviction on Count 3, Acevedo posits that the evidence was insufficient because, contrary to the district court's determination, the items he received from Lito did not meet the $5,000 threshold amount established in 18 U.S.C. § 666. Finally, he alleges that the district court erroneously considered payments made to him by Lito after the conspiracy had already concluded.

**1. Standard of Review**

Because Acevedo preserved his challenge to the sufficiency of the evidence, we review de novo the district court's denial of his motion for judgment of acquittal. United States v. Trinidad-Acosta, 773 F.3d 298, 310 (1st Cir. 2014). In so doing, we must determine whether "any reasonable jury could find all the elements of the crime [proven] beyond a reasonable doubt." United States v. Santos-Soto, 799 F.3d 49, 57 (1st Cir. 2015) (quoting United States v. Azubike, 564 F.3d 59, 64 (1st Cir. 2009)). We

-17-

need not conclude that "no verdict other than a guilty verdict could sensibly be reached, but must only [be] satisfied . . . that the guilty verdict finds support in a plausible rendition of the record." United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006) (internal quotation marks omitted).

In determining whether the record provides such support, we do not view each piece of evidence separately, re-weigh the evidence, or second-guess the jury's credibility calls. Santos-Soto, 799 F.3d at 57; United States v. Acosta-Colón, 741 F.3d 179, 191 (1st Cir. 2013). Instead, we evaluate the sum of all the evidence and inferences drawn therefrom in the light most favorable to the government, resolve all credibility disputes in its favor, and "determine whether that sum is enough for any reasonable jury to find all the elements of the crime proven beyond a reasonable doubt, even if the individual pieces of evidence are not enough when viewed in isolation." Santos-Soto, 799 F.3d at 57; see also United States v. Gaw, 817 F.3d 1, 3-4 (1st Cir. 2016); Acosta-Colón, 741 F.3d at 191 (noting that the court is required to choose the inference "most compatible" with the jury's guilty verdict when confronted with competing inferences). Furthermore, we need not be convinced "that the government succeeded in eliminating every possible theory consistent with the defendant's innocence."

Trinidad-Acosta, 773 F.3d at 310-11 (quoting United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009)).

In sum, we will only reverse on a sufficiency challenge if, "after viewing the evidence and reasonable inferences in the light most flattering to the prosecution, [we conclude that] no rational jury could have found him guilty beyond a reasonable doubt." Acosta-Colón, 741 F.3d at 191.

## 2. Applicable Law

To make out a case of conspiracy under 18 U.S.C. § 371, the government has to prove: 1) the existence of an agreement to commit an unlawful act; 2) the defendant's voluntary and knowing participation in the conspiracy; and, 3) an overt act committed in furtherance of the conspiracy. United States v. Ngige, 780 F.3d 497, 503 (1st Cir. 2015). "[A]n agreement to join a conspiracy may be express or tacit . . . and may be proved by direct or circumstantial evidence." United States v. McDonough, 727 F.3d 143, 156 (1st Cir. 2013) (internal quotations omitted). "Such evidence may include the defendants' acts that furthered the conspiracy's purposes." Id. In addition, to determine whether a conspiracy exists, we must consider "the totality of the circumstances, paying particular heed to factors such as the existence of a common goal, evidence of interdependence among the participants, and the degree to which their roles overlap."

-19-

United States v. Rodríguez-Reyes, 714 F.3d 1, 7 (1st Cir. 2013) (quoting United States v. Fenton, 367 F.3d 14, 19 (1st Cir. 2004)). Moreover, "each coconspirator need not know of or have contact with all other members of the conspiracy, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it." Id. (alteration omitted) (quoting United States v. Martínez-Medina, 279 F.3d 105, 113 (1st Cir. 2002)).

Here, the unlawful object of the agreement was the violation of 18 U.S.C. § 666, which criminalizes "bribery concerning programs receiving Federal funds." A bribe under this statute "must be made 'in connection with any business, transaction, or series of transactions of the covered organization, government, or agency involving anything of value of $5,000 or more.'" United States v. Bravo-Fernández, 722 F.3d 1, 12 (1st Cir. 2013) (alteration omitted) (quoting 18 U.S.C. § 666). This is known as the "transactional element requirement." Id. This Court has clarified that the transactional element requirement of $5,000 "refers to the value of the 'business' or 'transaction' sought to be influenced by the bribe," and not to the value of the bribe itself. Id. at 12-13.

That is, the bribe is anything of value "accepted or agreed to be accepted" and does not need to meet the $5,000 threshold; only the "subject matter of the bribe" (the "business"

-20-

or "transaction" sought to be influenced by the bribe) must be $5,000 or more. Id. at 13. However, when the subject matter of the bribe is an intangible or does not have a fixed price, "courts may look to the value of the bribe as evidence of the value of the 'business' . . . [or] 'transaction'" to determine if the transactional element requirement under § 666 is met. Id.

**3. Analysis**

With regard to his Count One conviction, Acevedo challenges only the district court's finding that he knowingly and voluntarily participated in the conspiracy. Thus, the other two elements of § 371 are not before us. A defendant's knowing and voluntary participation "can be proven through circumstantial evidence, including inferences from acts committed by the defendant that furthered the conspiracy's purposes." United States v. Castro-Davis, 612 F.3d 53, 60 (1st Cir. 2010) (quoting United States v. García-Pastrana, 584 F.3d 351, 377 (1st Cir. 2009)).

The evidence presented at trial is sufficient to permit a reasonable jury to conclude beyond a reasonable doubt that Acevedo knowingly and voluntarily participated in the conspiracy. The evidence, construed in the light most favorable to the verdict, shows that Lito and Lutgardo devised a scheme to get Lutgardo

acquitted of his pending criminal charges,[15] and that Lito informed Acevedo of the scheme and invited him to participate. Acevedo then accepted this invitation by notifying Lito that Lutgardo's case had been assigned to him and by going along with the plan to provide favorable treatment to Lutgardo, including acquitting him, in exchange for an appellate judgeship,[16] money, meals and drinks, gifts, the remodeling of some areas in Acevedo's house, and employment for his brother and nephew. Acevedo complied with his part of the agreement by: advising Lito regarding what motions defense counsel should file and when to file them, reviewing and editing those motions before they were filed, and giving Lito advanced notice as to how he would rule on them; reviewing and discussing with Lito a diagram of the accident; twice visiting the site of the accident with Lito and sharing his impressions with him so that Lito could, in turn, relay that information to Lutgardo's defense counsel; suggesting that defense counsel use phone records to cross-examine the government's eye witnesses; scheduling the trial for Holy Week to avoid drawing too much

---

[15] Acevedo concedes as much.

[16] That Acevedo had not applied to a position at the Court of Appeals since 2008 is of no consequence. The jury could draw the reasonable inference that Acevedo was waiting to get Anaudi's endorsement before officially applying for the position or that he meant to apply after the trial ended, but failed to do so because of the public concern raised by the April 5 incident.

attention to it; using Lito as an intermediary to communicate with defense counsel during trial and informing them what they needed to do; precluding the prosecution from calling rebuttal witnesses; and finally acquitting Lutgardo of all charges.

Furthermore, additional evidence shows that Acevedo also cashed in on his participation on the scheme. It shows that Acevedo went out for months to restaurants and bars with Lito and that all expenses were paid by Lito with money provided by Lutgardo. He also voluntarily accepted gifts, money, payments to the Treasury Department on his behalf, and remodeling work at his house. Furthermore, Acevedo took affirmative steps to procure help from Anaudi (to whom Lutgardo was a "special friend") in order to obtain a seat on the Court of Appeals and government jobs for his brother and nephew.

The government presented not only testimonial evidence -- with some witnesses corroborating the testimony of others[17] -- but also additional corroborating evidence including: recorded conversations between Lito and Acevedo and between Lito and Lutgardo; bank records; receipts from Macy's, Budget Car Rental,

---

[17] Such was the case with Lorenzo, Lutgardo's cousin and driver. Lorenzo's testimony corroborated Lito's testimony about the nature of the bribery agreement, Lito's role as a middleman between Lutgardo and Acevedo, and his own role as an intermediary between Acevedo, Lito, and defense counsel during Lutgardo's state trial.

the hardware store where the materials used to remodel Acevedo's garage had been purchased, and various restaurants; cufflinks and watches that Lito had gifted Acevedo; Acevedo's, Saúl's, and Miguel's resumes; numerous photos of Lito hanging out with Acevedo, of Acevedo sitting on the red motorcycle that Lito had bought for him, and of Lito hanging out with Lutgardo and his defense counsel; toll records for Lito's rented car on April 5; records from the Puerto Rico Treasury Department regarding Acevedo's debt and payments; and statements from Acevedo when he was questioned by law enforcement the day the FBI searched his house. In the recorded conversations the jury heard Acevedo giving advice to Lito three days before the trial started, about how Lutgardo's defense counsel could use phone records to attack the prosecution's case. In this same recording, the jury heard Lito, on behalf of Lutgardo, reimbursing Acevedo for some construction materials related to the remodeling of his garage. Furthermore, in another recorded conversation between Lito and Acevedo, the jury heard Acevedo: lamenting the day he was assigned to preside over Lutgardo's case; complaining that Anaudi had not yet called him with news on the appellate judgeship; talking about the red motorcycle that Lito had bought for him; and stating that Officer Soto had "screwed" them.

Considering the sum of all the evidence and the reasonable inferences drawn therefrom in the light most favorable to the verdict, we conclude that a reasonable jury could have found beyond a reasonable doubt that Acevedo knowingly and voluntarily participated in the conspiracy to acquit Lutgardo. Furthermore, Acevedo's argument that he never saw, heard, met or discussed anything with Lutgardo fails because "each coconspirator need not know of or have contact with all other members of the conspiracy, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it." Rodríguez-Reyes, 714 F.3d at 7. Thus, evidence that Acevedo met or talked to Lutgardo was not required to prove his participation in the conspiracy.

We also find that there was sufficient evidence to support Acevedo's conviction on Count Three. Here, Lutgardo's acquittal was the "business" or "transaction" in connection to which the bribe was made. However, because the monetary value of Lutgardo's acquittal cannot be determined, we evaluate the value of the bribe to determine if the transactional element requirement is met. Acevedo concedes that he received $4,615 in benefits from Lutgardo, including a $3,788 tax debt paid to the Treasury Department by Lito, $420 in gifts from Macy's, and $407 related to some other expenses for which receipts were entered into evidence.

Moreover, the evidence at trial demonstrates that Acevedo received other benefits and items valued over $385 that, combined with the $4,615 that Acevedo concedes, would meet the $5,000 threshold.

A summary of expenditures prepared by Lito, and introduced into evidence at trial, shows a total of $63,380 in payments made to Acevedo or on Acevedo's behalf, including $18,720 in labor costs related to the construction work in Acevedo's house and $4,550 in expenses in restaurants and bars. In addition, Acevedo also expected to receive an appellate judgeship and jobs for Saúl and Miguel at the Treasury Department and the State Insurance Fund Corporation, respectively. From the appellate judgeship alone, Acevedo would have received a salary increase of around $15,400 annually until his retirement at age 70.[18]

The government also points to the $3,000 to $4,000 cash payment that Acevedo received in April 2013, after the April 5 incident, to cover expenses related to any investigation or possible charges that could be brought against him. Acevedo argues, however, that this amount should not be considered because the alleged conspiracy had concluded by then. The government, on

---

[18] Ms. Ginorli Maldonado, the Director of the Office of Budget and Planning at the Puerto Rico Court Administration testified that a Superior Court Judge's yearly salary is $89,600, whereas a state appellate judge earns $105,000 annually. We also note that in Acevedo-López this court calculated Acevedo's expected benefit from the appellate judgeship to be $123,200, based on the years remaining until Acevedo's retirement. 873 F.3d at 335.

the contrary, argues that the conspiracy was still ongoing because Lito and Lutgardo still had to make good on their promise of benefits to Acevedo. We need not decide this issue because even if we do not take into consideration the payment in question, § 666's $5,000 threshold is easily met with the $63,380 in expenditures and/or the expected salary increase from the appellate judgeship. Accordingly, the district court did not err in finding that the transactional element under § 666 was met.

## B. Challenged Remarks during Opening Statement and Closing Argument, and Miriam Rodríguez's Testimony

Acevedo next argues that the government improperly appealed to the jury's emotions and inflamed the passions of the jurors through its opening statement and closing argument, as well as with its presentation of Miriam Rodríguez ("Rodríguez"), Babilonia's mother-in-law, as a witness.

Acevedo complains of the following remarks during the government's opening statement:

> Félix Babilonia was 49 years old when he was killed on the evening of June 30, 2012. He was involved in a car collision, with another vehicle driven by [Lut]gardo Acevedo López on the west coast of Puerto Rico. When Félix died he left behind his wife Lesley and three children. Lutgardo was charged with among other crimes, vehicular homicide and his criminal trial was eventually assigned to the defendant, Manuel Acevedo Hernández. However, the defendant did not give Félix Babilonia and his family a fair trial. Did not give them justice. Instead his greed and ambition had him take bribes, from Lutgardo, more than $50,000.00 in goods and services in exchange for

-27-

finding him not guilty, violating the very core of the institution that the defendant swore to uphold.

. . .

On March 2013 [sic], the Félix Babilonia's [sic] family entered a courtroom such as this one, expecting and deserving fairness. Lutgardo was charged with vehicular homicide because witnesses said he had been driving drunk and high. Lutgardo was charged with obstruction of justice because he refused to take a breathalyzer test. Félix's family deserved justice. They deserved a fair trial where everyone followed rules. Did they get that? No. Why not? Because when they walked into that courtroom the Judge that they saw sitting on the bench is the man sitting right there. Defendant Manuel Acevedo Hernández. And [in] his courtroom justice was for sale.

. . .

The defendant is entitled to a fair trial, unlike the one he denied Félix Babilonia's family, and the law requires us to prove him guilty beyond a reasonable doubt. We embrace the burden, ladies and gentlemen, and we want you to hold us to it.

Regarding closing argument, Acevedo does not point to any specific statement, but rather argues generally that during closing argument, "the government retook the theme that justice had been denied by [Acevedo] to . . . Babilonia."[19]

---

[19] The record reveals that the prosecutor mentioned the term "justice" twice during the government's closing argument; once at the beginning of his argument, when he stated that Acevedo "did not give Félix Babilonia and his family justice" and at the end of his argument, when he stated that "[a] guilty verdict here for both counts will embrace justice."

On the second day of trial, Rodríguez, Babilonia's mother-in-law, briefly testified as part of the government's case-in-chief. When Rodríguez was called to the witness stand, defense counsel asked for a proffer of her testimony. In response, the prosecutor explained that Rodríguez would provide "a little bit of background about [her] son-in-law['s] life" and would also testify about what she observed in state court when she attended Lutgardo's trial. Defense counsel stated that it would be "improper" for Rodríguez's testimony to include "her interpretations of what happened in court." The district court allowed Rodríguez to testify as long as her testimony was based on personal knowledge.

Thereafter, Rodríguez testified, without any objection, that Babilonia, "an excellent man and a marvelous father" of three, died as a result of a "car collision" on June 30, 2012. She also testified, again without objection, that his family lost his income when he passed away, and had not overcome his death. Rodríguez further testified that Lutgardo was charged with "vehicular homicide" for Babilonia's death, that the case was assigned to Acevedo, and that she attended Lutgardo's state trial. Additionally, she testified that it "seemed odd" that Acevedo suggested in January 2013 that expert reports on Lutgardo's BMW might be important, that Acevedo then ordered the government to turn over Lutgardo's BMW so that defense counsel could hire an

expert to examine it, and that Acevedo postponed the trial date until March so that Lutgardo could retain an expert to examine the car. When Rodríguez was asked by the prosecutor whether she had been able to observe Acevedo's demeanor during the trial, Acevedo's defense counsel objected because Rodríguez was not "the best evidence" as to "what happened in court."

In response to defense counsel's objection, the court held a sidebar discussion where the prosecutor explained that he was asking about what Rodríguez had observed at trial because following the trial, she had made "an official complaint" against Acevedo. Defense counsel argued that the fact that Rodríguez had filed a complaint against Acevedo was irrelevant. The court stated that it had been "very attentive to see" that Rodríguez's testimony had not turned into "an emotional rally," determined that there was "no indicia" of having "appeal[ed] to the jury emotions" and that Rodríguez's testimony had been "pretty factual," and therefore allowed the government's line of questioning to continue as long as it was limited to the fact that Rodríguez felt the process had been "unfair and that [had] lead her to file a complaint." Back in open court, in response to the government's line of questioning, Rodríguez then testified that her impression was that the trial had been unfair and, after she

heard in the news that Lito had been stopped while accompanied by Acevedo, she decided to file a complaint against Acevedo.

On appeal, Acevedo argues that the government's opening statement and closing argument concentrated on seeking justice for Babilonia and his family. Yet, whether justice had been denied to Babilonia or his family did not go to any of the elements of the crimes being charged. Likewise, Acevedo contends that Rodríguez's testimony, although initially portrayed by the government as "factual," turned out not to be factual at all because it did not go to any of the elements of the charges that Acevedo was facing, and she knew nothing about the conspiracy or the alleged bribe. Thus, the government's remarks at opening statement and closing argument, as well as Rodríguez's testimony, were irrelevant and improper, and "only appealed to the jury's sentiment." According to Acevedo, by making these remarks and introducing Rodríguez's testimony, the government "distorted the issues, gave weight to an unrelated matter and appealed to the jury to find for the government," tainting the jury's verdict and resulting in prejudice to Acevedo, which warrants a new trial.

## 1. Unpreserved Challenges to Opening Statement, Closing Argument, and Rodríguez's Testimony

Acevedo did not object to the prosecutor's remarks during the government's opening statement or closing argument. Nor did he object to the admission of Rodríguez's testimony about

Babilonia and the effects of his death on his family.  Thus, we review Acevedo's newly raised challenges for plain error.[20]  United States v. Rodríguez, 675 F.3d 48, 64 (1st Cir. 2012); see also United States v. González-Pérez, 778 F.3d 3, 19 (1st Cir. 2015); United States v. Flemmi, 402 F.3d 79, 86 (1st Cir. 2005).  In order to succeed under the plain error standard, the "defendant must demonstrate: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Moran, 393 F.3d 1, 13 (1st Cir. 2004) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)).  This standard of review places a heavy burden on the defendant and "tends to afford relief . . . only for 'blockbuster' errors."  Id. (quoting United States v. Griffin, 818 F.2d 97, 100 (1st Cir. 1987)).

The government maintains that there was no error in the government's opening statement and closing argument because the

---

[20]  Where a timely objection has been made to a statement in the government's opening or closing, we review de novo whether the challenged portion of the government's statement was improper and if so, whether it was harmful. United States v. Appolon, 695 F.3d 44, 66 (1st Cir. 2012). However, improper remarks by the government "are grounds for reversal only if they 'so poisoned the well' as to have likely affected the trial's outcome."  United States v. Mooney, 315 F.3d 54, 60 (1st Cir. 2002) (quoting United States v. Cartagena-Carrasquillo, 70 F.3d 706, 713 (1st Cir. 1995)).

challenged remarks merely tied "the bribery scheme to the vehicular-manslaughter case from which it arose." According to the government, when "charging a judge with taking a bribe to fix a criminal trial, [the government] can permissibly remind jurors that the judge's actions had the effect of depriving the parties to that case . . . of a fair trial" and, here, the challenged remarks had the purpose of establishing that Acevedo's "conduct had real-world victims and consequences." The government further notes that the prosecution alluded to Babilonia only a few times during the course of a seven-day trial, that most of these instances were days before the jury deliberated, and that it did not mention Babilonia at all during its rebuttal, so any alleged impropriety was neither pervasive nor severe. Alternatively, the government maintains that "any impropriety was not clear or obvious" and, consequently, does not amount to clear error. Specifically as to Rodríguez's testimony, the government argues that the district court made a specific finding that there had been no indicia of the government appealing to the jury emotions and that the court had been "very attentive to see that [Rodríguez's testimony] was not going to turn into an emotional rally and it [had] not." Finally the government maintains that, even if the government's remarks at opening statement or closing argument, and Rodríguez's unchallenged testimony had been clearly

erroneous, reversal is not warranted because they did not "so poison[] the well that the trial's outcome was likely affected."

We need not decide whether there was an error in admitting Rodríguez's unchallenged testimony, or in the government's opening statement or closing argument, or whether the alleged errors were clear or obvious because, even assuming that Acevedo meets the first two prongs of the plain error standard, his challenges nevertheless fail under the last two prongs.

Acevedo did not demonstrate that any alleged error affected his substantial rights or that they impaired the fairness, integrity, or the public reputation of the judicial proceedings. We are hard-pressed to find that Acevedo's substantial rights were affected considering the strength of the evidence against him, which included, among other things, direct evidence of Acevedo (in his own voice) providing strategic legal advice to Lutgardo's counsel, the testimony of numerous witnesses (including Lito), and corroborating evidence of these testimonies, such as recorded conversations, phone records, photos, receipts, toll records, and gifts that were seized from Acevedo's house. We are confident that this overwhelming evidence "would have corrected any jury misperception arising from the government's opening statement [or closing argument]" or from Rodríguez's unchallenged testimony. United States v. Cruz, 156 F.3d 22, 31 (1st Cir. 1998). Moreover,

regarding the remarks made during the government's opening statement and closing argument, the district court instructed the jury that statements by the attorneys did not constitute evidence, and the jury is presumed to have followed these instructions. Cf. Rodríguez, 675 F.3d at 63. Because, "any lingering prejudicial effect from the [government's] remarks [or Rodríguez's unchallenged testimony] pales in comparison with the overwhelming strength of the government's evidence against [Acevedo]," United States v. Mooney, 315 F.3d 54, 60 (1st Cir. 2002), the comments referring to the denial of justice to Babilonia and his family and the testimony about the effects of Babilonia's death on his family do not amount to reversible plain error.

**2. Preserved Challenge to Rodríguez's Testimony**

Because Acevedo launched a timely objection to Rodríguez's testimony about Acevedo's conduct during Lutgardo's state trial, we review the admission of that part of her testimony for abuse of discretion. Gay v. Stonebridge Life Ins. Co., 660 F.3d 58, 61 (1st Cir. 2011); Peña-Crespo v. Puerto Rico, 408 F.3d 10, 14 (1st Cir. 2005). If we determine that the court abused its discretion in admitting the testimony, "we then review the admission for harmless error." Gay, 660 F.3d at 62. "The essential inquiry in harmless error review is whether the improperly admitted evidence likely affected the outcome of [the]

trial." United States v. Torres-Galindo, 206 F.3d 136, 141 (1st Cir. 2000).

The government argues that the district court did not abuse its discretion in allowing Rodríguez to testify about Acevedo's handling of Lutgardo's state trial and her filing of a complaint against him because this testimony was relevant. It posits that "federal rules of evidence set a very low bar for relevance, allowing admission if the evidence has any tendency to make a material fact more or less likely" and that, here, her testimony "clears that low bar." (Internal quotation marks omitted). It further argues that Rodríguez's observation that Acevedo frequently ruled in favor of Lutgardo, as well as her explanation of the circumstances leading to her filing of a complaint, "had at least some tendency to show that [Acevedo] was on the take."

Although we agree with the government that Rodríguez's testimony clears the low bar for relevance, we note that even relevant evidence is subject to exclusion if its unfair prejudicial effect substantially outweighs its probative value. United States v. Breton, 740 F.3d 1, 14 (1st Cir. 2014) (quoting Fed. R. Evid. 403). We need not decide, however, whether the district court abused its discretion in allowing Rodríguez's testimony because, even if we were to find that the testimony should have been

excluded, the error would be harmless.  Given the strength of the evidence against Acevedo, we find that Rodríguez's testimony did not affect the outcome of the case.  See, e.g., United States v. Rose, 104 F.3d 1408, 1414 (1st Cir. 1997) (finding that admission of potentially inflammatory evidence was an abuse of discretion, but harmless because of overwhelming evidence of guilt).  Thus, Rodríguez's testimony, while perhaps best left out, was not reversible error.

## C.  Lutgardo's Fifth Amendment Privilege

Lutgardo invoked his right against self-incrimination after Acevedo subpoenaed him to testify at trial.  The district court convened a hearing outside the presence of the jury to conduct an inquiry into Lutgardo's invocation of the Fifth Amendment privilege.  Acevedo's defense counsel presented the questions he would pose to Lutgardo were he to testify.  The questions focused on Lito and the "monies given to him" by Lutgardo.  Lutgardo, who was assisted by counsel, declined to answer the questions, fearing the answers could expose him to additional criminal charges.  The trial court upheld the privilege, finding that "based on the proposed questions of examination . . . [Lutgardo] could be exposing himself to the filing of not only possible Federal charges but possible State charges and other charges by any other entity."

We review "favorable rulings on th[e] invocation of the Fifth Amendment privilege for abuse of discretion." United States v. Ramos, 763 F.3d 45, 53 (1st Cir. 2014) (citing United States v. Gary, 74 F.3d 304, 310 (1st Cir. 1996)). We will reverse a district court's determination that a witness properly invoked the privilege only when it is "perfectly clear . . . that the answers [sought from the witness] cannot possibly incriminate." United States v. De la Cruz, 996 F.2d 1307, 1312 (1st Cir. 1993) (omission in original) (internal quotation marks omitted) (citing United States v. Johnson, 488 F.2d 1206, 1209 (1st Cir. 1973)). After careful review of the record, we discern no abuse of discretion in the district court's ruling.

Acevedo claims that the district court infringed upon his Sixth Amendment right to present a defense by allowing Lutgardo to invoke his Fifth Amendment privilege against self-incrimination. The Sixth Amendment guarantees an accused's right "to have compulsory process for obtaining witnesses in his favor," U.S. Const. amend. VI, which includes "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary." Washington v. Texas, 388 U.S. 14, 18–19 (1967). The Sixth Amendment, however, does not provide an absolute right to present a defense. See DiBenedetto v. Hall, 272 F.3d 1, 8 (1st Cir. 2001) ("[A] defendant's right to present relevant evidence is

not unlimited, but rather is subject to reasonable restrictions . . . and evidentiary exclusions will not violate the constitution so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." (internal quotation marks omitted) (quoting United States v. Scheffer, 523 U.S. 303, 308 (1998))); Gary, 74 F.3d at 309 ("[T]he Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversary system." (quoting United States v. Nobles, 422 U.S. 225, 241 (1975))). Consequently, we have held that "a witness may invoke the Fifth Amendment if testifying might incriminate him on direct or cross-examination, despite a defendant's Sixth Amendment interests in presenting that testimony." Ramos, 763 F.3d at 53. The witness need only show "some reasonable possibility that, by testifying, he may open himself to prosecution." United States v. Castro, 129 F.3d 226, 229 (1st Cir. 1997) (citing In re Kave, 760 F.2d 343, 354 (1st Cir. 1985)).

We turn to Acevedo's contention that Lutgardo could not invoke the Fifth Amendment because Acevedo's defense counsel would only ask questions related to facts to which Lutgardo had already pled guilty. We have found this reasoning to be "overly simplistic," as it ignores what the government might bring up during cross examination that the conviction does not shield from

criminal liability, and the fact that the plea agreement does not preclude further federal or state prosecution. Id. at 231-32. The district court appropriately noted that the plea colloquy "leaves open the door" on cross examination and allows "space for the government to conduct an investigation possibly charging Mr. Lutgardo Acevedo." It added that, were Lutgardo to testify, he would have to answer questions on cross examination without limiting his responses. While this court has acknowledged that the government does not have a constitutional right to cross-examine defense witnesses, we have also recognized that it is "one of the legitimate demands of the adversary system." Gary, 74 F.3d at 309. We ordinarily do not allow a witness to testify on direct if the court has "adequate reason to believe that the witness validly will invoke the Fifth Amendment on cross-examination with regard to matters which are bound up with those discussed on direct." Castro, 129 F.3d at 230 (citing Gary, 74 F.3d at 309).

Here, Lutgardo understood that by answering Acevedo's questions, as well as any follow-up questions, he might have incriminated himself as to other criminal conduct for which future charges could be filed against him. Lutgardo did not face a "particularly onerous burden" to validly invoke the Fifth Amendment. Id. at 229. Rather, it simply "need[ed] [to] be evident from the implications of the question . . . that a

responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." Ramos, 763 F.3d at 55; see also Castro, 129 F.3d at 229 ("For the privilege to attach, the questions and answers need not be directly incriminating. If a reply to a seemingly innocuous question reasonably will tend to sculpt a rung in the ladder of evidence leading to prosecution, the privilege appropriately may be invoked." (citing Hoffman v. United States, 341 U.S. 479, 486 (1951))). The court had adequate reason to believe that Lutgardo faced potential incrimination and would not answer any questions on cross examination even if he was allowed to answer Acevedo's questions on direct examination. During the district court's inquiry, the prosecutor provided a specific example of a potential line of questioning for cross examination: "the United States would have the opportunity . . . to explore [Lutgardo's] relationship with [Lito] or any others," and "whether he has done other criminal activity with that individual, whether it relates to taxes or otherwise." The government, in an effort to undercut Acevedo's claim that Lito simply sought to obtain money from Lutgardo and to do so had involved Acevedo without his knowledge, could have gone into further detail as to other incidents, not necessarily limited to Lito, which would have given the government the opportunity to ask if Lutgardo had been involved

in drug transactions with Lito, a question he would have declined to answer.  Thus, the cross examination would have been rendered ineffective, and, as the district court noted, "[t]he determination ha[d] to be done with both elements in the balance."[21] See Ramos, 763 F.3d at 55 ("It is crucial for a district court to inform its discretion through appropriate inquiries.").

Moreover, as the district court correctly emphasized, Lutgardo had yet to be sentenced.  A defendant who has been convicted but is awaiting sentencing "retains a legitimate protectable Fifth Amendment interest as to matters that could affect his sentence."  Id. at 54 (quoting De la Cruz, 996 F.2d at 1312).  Any potentially incriminating statements during Lutgardo's testimony, or statements and evidence casting him in a negative light, could have unfavorably affected his sentence.  See De la Cruz, 996 F.2d at 1313 (finding that the convicted defendant's compelled testimony could have affected his chances at any possible sentencing reduction or might have exposed him to enhancements).  Nothing in Lutgardo's plea agreement prevented the sentencing

---

[21]  To the extent Acevedo claims that the district court should have limited the government's cross examination, here, "effective government cross-examination would have been seriously impaired if the prosecutor were denied latitude to explore" Lito and Lutgardo's dealings.  De la Cruz, 996 F.2d at 1313.  We have held that courts may not limit cross examination when that limitation would be unduly prejudicial to a party.  Gary, 74 F.3d at 311-12.

court from using such statements against him when determining his sentence.

The record reveals that the district court carefully assessed Lutgardo's invocation of the Fifth Amendment and exercised its discretion appropriately.  In light of the district court's thorough inquiry and the "substantial and real . . . hazards of incrimination," Ramos, 763 F.3d at 55 (internal quotation marks omitted), we conclude that the district court did not abuse its discretion in declining to compel Lutgardo's testimony.

**D.  Sentencing**

Acevedo argues that the district court erred in calculating the applicable GSR in two respects. First, he contends that the court's determination that the offense included more than one bribe, and its consequent imposition of a two-level enhancement under U.S.S.G. § 2C1.1(b)(1),[22] was incorrect because the offense only involved a single incident of bribery which sought to obtain one benefit -- Lutgardo's acquittal.  According to Acevedo, that the scheme included a number of installment payments that "varied in quantity is inconsequential and irrelevant," because the

---

[22]  U.S.S.G. § 2C1.1(b)(1) directs the court to increase the base offense level by two levels "[i]f the offense involved more than one bribe or extortion."

purpose of the bribe was singular. Acevedo notes that, as the district court found, the cash payment that Lito made to Acevedo after the April 5 incident was for a purpose other than obtaining Lutgardo's acquittal. He argues that, however, this payment should have not been considered because it did not fall within the conspiracy and bribe charged since that conspiracy had already ended by then. Second, Acevedo argues that the court erred in calculating the value to be obtained by him for his participation in the bribe, for purposes of applying a ten-level enhancement under U.S.S.G. § 2C1.1(b)(2). He posits that the salary increase of $92,400,[23] on which the ten-level enhancement partially relied, is impermissibly speculative because he never applied for the appellate judgeship and the record does not show that he would have received it. In consequence, his argument goes, the increase in salary between a superior judge and an appellate judge should not have been considered. Acevedo admits to having received benefits amounting to $63,380, which he argues would warrant only a six-level enhancement.

---

[23] The court arrived at this amount by multiplying $15,400 (the increase in salary that Acevedo would have received had he been appointed to the Court of Appeals ($105,000 for an appellate judge yearly salary minus $89,600 for a superior judge yearly salary)) by six, which was the most conservative number of years that Acevedo would have held that position until his retirement at age seventy.

In response to Acevedo's arguments, the government alleges that Lito and Lutgardo bribed Acevedo to "provide favorable treatment throughout Lutgardo's state case," which would not only get Lutgardo acquitted, but also give the appearance that the acquittal had been reasonable. According to the government, multiple acts taken by Acevedo to support Lutgardo's acquittal (e.g. Acevedo's rulings on motions, strategy advice, ex parte visits to the site of the accident, etc.) point toward multiple bribes. Moreover, the government argues that the scheme involved different forms of payment -- gifts, payments, remodeling work, social outings, a motorcycle, and an appellate judgeship -- and that the payment made after Lutgardo's acquittal was made during the scope of the conspiracy, which still existed by January 2014 when Lito and Lutgardo created a backdated contract to provide a false explanation for the money that Lutgardo gave Lito in furtherance of the conspiracy.

Regarding the ten-level enhancement under § 2C1.1(b)(2), the government argues that, under United States v. Berroa, 856 F.3d 141, 162 (1st Cir. 2017), the enhancement was proper because it applies so long as Acevedo "received or expected to receive the requisite benefit." The government tells us that the language of the Guidelines "prescribes a 'forward-looking' inquiry that focuses on the defendant's reasonable expectation at the time of

-45-

the offense" thus, making irrelevant that Acevedo did not apply for the appellate judgeship, and points to evidence in the record showing that Acevedo expected the appellate judgeship.

The government further urges us to uphold Acevedo's sentence by finding that any error in calculating the GSR would nonetheless be harmless in light of the district court's statement that it would impose the same sentence even if the applicable GSR would have been lower.

Both of Acevedo's alleged sentencing errors go to the calculation of the GSR. Yet, aware of the parties' disagreement as to the proper calculation of the GSR, the district court made it abundantly clear that it would have imposed the same sentence regardless of the applicable GSR. It stated the following:

> I would like to make clear that regardless of the application of the guidelines, regardless of whether any other of those adjustments would have been proper, this Court would have, considering such a determination, that the guidelines would not properly reflect the seriousness of the offense and the participation of this defendant and the Court would have engaged in a variance under the 3553 factors and would have imposed the same sentence that I am imposing here today.

In light of this clear indication in the record that the court would have imposed the same sentence even without any of the alleged errors, we find that any errors in calculating Acevedo's GSR would have been harmless. See United States v. Tavares, 705 F.3d 4, 25 (1st Cir. 2013) ("If 'the district court would have

-46-

imposed the same sentence' even without the error, it was harmless." (quoting Williams v. United States, 503 U.S. 193, 202-03 (1992))).

## E. Cumulative Error

Acevedo also seeks reversal based on the cumulative error doctrine. Having found that some of Acevedo's allegations of error are entirely without merit, and that none of the alleged errors resulted in substantial prejudice or affected the outcome of the trial, we also conclude that the aggregate effect of his claimed errors does not call for reversal either. See United States v. Peña-Santo, 809 F.3d 686, 702 (1st Cir. 2015); Torres-Galindo, 206 F.3d at 141. The evidence against Acevedo was overwhelming, and "the district court did not conduct the trial in a manner that undermined his right to a fair trial." Peña-Santo, 809 F.3d at 702-03. Consequently, we reject his contention that his conviction was tainted by cumulative error.

## III. Conclusion

The record reflects that Acevedo's conviction was not tainted by prejudicial error either from the admission of Rodríguez's testimony or in the government's opening statement or closing argument, and the evidence of his guilt was more than sufficient to support the jury's verdict. It further shows that the court did not abuse its discretion in upholding Lutgardo's

invocation of his Fifth Amendment privilege.  Finally, the record reflects that any sentencing error would be harmless. Accordingly, Acevedo's conviction and sentence are affirmed.

**<u>Affirmed</u>**.