# United States Court of Appeals
## For the First Circuit

No. 15-2523

UNITED STATES OF AMERICA,

Appellee,

v.

LUTGARDO ACEVEDO-LÓPEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Torruella, Lipez, and Barron,
Circuit Judges.

Martin G. Weinberg, with whom Kimberly Homan, were on brief, for appellant.
Juan Carlos Reyes-Ramos, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

October 11, 2017

**TORRUELLA, Circuit Judge**. Defendant-Appellant Lutgardo Acevedo-López ("Acevedo") pled guilty to violating 18 U.S.C. §§ 371 and 666(a) by conspiring to bribe and paying a bribe to a judge on the Puerto Rico Court of First Instance. Acevedo appeals his sentence of nine years' imprisonment. We affirm.

## I. BACKGROUND

### A. Factual Background

Prosecutors in the Aguadilla judicial region of Puerto Rico charged Acevedo with aggravated negligent homicide, obstruction of justice, and driving under the influence of alcoholic beverages after he killed another driver in a car accident on June 30, 2012. In November 2012, Ángel Román-Badillo ("Lito") -- a long-time acquaintance of Acevedo -- met with Manuel Acevedo-Hernández (the "Judge"), a Puerto Rico Superior Court Judge in the Aguadilla judicial region, and the Judge's brother, Saúl Acevedo-Hernández ("Saúl"), and nephew, Miguel Acevedo-Manjo ("Miguel") at a restaurant.[1] They discussed Acevedo's case, and Lito told the Judge that Acevedo's case would be assigned to him. The Judge told Lito that, if he was assigned the case, he would let Lito know.

---

[1] Because a number of people mentioned in this opinion have the last name "Acevedo," we refer to them by either their first name or a nickname used in the record. We mean no disrespect in doing so.

In subsequent meetings, the Judge informed Lito that the case had been officially assigned to him. The Judge commented that Acevedo's criminal case was so delicate that it "could not be worked on, not even for $100,000," but the Judge also stated that he wanted a seat on the state appellate court and government jobs for Saúl and Miguel.

The Judge eventually agreed to provide Acevedo with favorable treatment. From November 2012 to April 2013, Lito would invite the Judge, Saúl, Miguel, and other friends to bars and restaurants, and Acevedo would pay for everything. Through Lito, Acevedo also: (1) paid the Judge's pending state income tax debt; (2) bought the Judge gifts; (3) arranged for construction improvements on the Judge's garage; and (4) purchased a used motorcycle for the Judge.

Acevedo also worked to procure a seat on the state appellate court for the Judge. In December 2012, Acevedo arranged a meeting at a golf tournament between the Judge and Anaudi Hernández ("Hernández"), a businessman with connections to the then-Governor-elect who had previously helped another judge get reappointed. On December 30, 2012, Lito drove the Judge to the golf tournament. At the tournament, Lutgardo Acevedo-López II ("Bebé"), Acevedo's brother, told Hernández that he wanted to introduce Hernández to a friend who aspired to be an appellate

-3-

judge. The Judge became nervous because he was presiding over Acevedo's case, however, and he did not meet Hernández at the tournament. A few weeks later, however, on January 21, 2013, Lito drove the Judge to Hernández's residence to discuss the Judge's potential appointment to the appellate court. During the meeting, the Judge told Acevedo that his dream was to retire as an appellate judge.

In return for these inducements, the Judge provided help with Acevedo's case. Between January and March 2013, Acevedo provided the Judge with draft court filings for his review and advice prior to filing. Further, on March 22, 2013, the Judge met with Lito to discuss Acevedo's case and provide strategic legal advice. On March 27, 2013, the Judge acquitted Acevedo of all charges.

On April 5, 2013, Lito drove the Judge to a seminar. Later that day, Puerto Rico police officers stopped Lito, still with the Judge, for suspected driving while under the influence of alcohol. The Judge intervened on Lito's behalf, but some of the officers had been involved in the case against Acevedo, and they identified Lito as Acevedo's associate and raised concerns about the Judge's association with Lito. This eventually led to a federal investigation.

## B.  Procedural History

On June 3, 2014, federal officers arrested Acevedo in the Southern District of Florida.  On June 6, 2014, a magistrate judge in the Southern District of Florida ordered that Acevedo be detained and removed to the District of Puerto Rico.  On July 14, 2014, the district court for the district of Puerto Rico conducted a de novo detention hearing and reinstated the Florida magistrate's detention order.

On August 14, 2014, Acevedo entered into a plea agreement.  The parties stipulated to a total offense level of twenty-three, but Acevedo's presentence investigation report (the "PSR") initially recommended a total offense level of twenty-nine.  Acevedo filed several objections to the PSR.  In response to those objections, the probation officer issued an addendum to the PSR on November 3, 2015.  The addendum included a revised calculation of the benefits received by the Judge under U.S.S.G. § 2C1.1(b)(2), which reduced the recommended total offense level from twenty-nine to twenty-seven.

The district court held a sentencing hearing on November 6, 2015.  Among other things, the district court found that the annual salary increase that the Judge would have received if he had been appointed as an appellate judge, totaling $123,200 over eight years, was to be included in calculating the value of

the bribe under U.S.S.G. § 2C1.1(b)(2). The district court also found that the conspiracy involved at least five criminally-responsible participants and was also otherwise-extensive under U.S.S.G. § 3B1.1(a). Altogether, the district court calculated a total offense level of twenty-seven and a recommended sentencing range of seventy to eighty-seven months of imprisonment. After reviewing the 18 U.S.C. § 3553(a) factors, however, the district court determined that "the circumstances surrounding this offense fall completely out of the heartland of the Sentencing Guidelines," and so "a variance [was] warranted." Considering "the seriousness of the offense and all of the factors," the district court therefore sentenced Acevedo to 108 months of imprisonment, one year less than the statutory maximum.

Acevedo appealed his sentence.

## II. ANALYSIS

Acevedo raises a plethora of purported procedural sentencing errors made by the district court. We address them each in turn.

We review the district court's legal interpretation and application of the Sentencing Guidelines de novo, its findings of fact -- including calculations of value -- for clear error, and its judgment calls for abuse of discretion. United States v.

Houston, 857 F.3d 427, 432 (1st Cir. 2017); see also United States

v. Vázquez-Botet, 532 F.3d 37, 65 (1st Cir. 2008).

**A.    The District Court Did Not Err in Calculating the Value of the Benefit to the Judge**

Acevedo's first claim of error is that the district court

miscalculated the value of "anything obtained or to be obtained"

by the Judge under U.S.S.G. § 2C1.1(b)(2).  U.S.S.G. § 2C1.1(b)(2)[2]

provides:

> If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $5,000, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

Acevedo's plea agreement calculated the "Value of the Payment" as

more than $30,000 but less than $95,000, which corresponded to a

six-level increase.[3]

But the district court conducted its own calculation.

Because it could not determine the monetary value to Acevedo of an

---

[2]  Acevedo's PSR and the district court quoted the November 1, 2013 edition of the United States Sentencing Guidelines Manual in this instance.  We do so as well.

[3]  As the plea agreement indicates only a six-level increase in light of U.S.S.G § 2C1.1(b)(2), the plea agreement presumably contemplated that the "value of the payment" did not exceed $70,000.  See U.S.S.G § 2C1.1(b)(2) (referencing the table at § 2B1.1).

acquittal, or the loss to the government, the district court calculated the value of what was "to be obtained by [the Judge]" -- which it found was an appellate judgeship -- pursuant to his agreement to provide Acevedo favorable treatment. It determined that the Judge would have received an extra $15,400 per year in annual salary if he had been appointed to the appellate court, and that he would have received that additional salary from 2013 -- the year the Judge acquitted Acevedo -- until 2021, when the Judge would reach the mandatory retirement age of seventy. This increased salary over a period of eight years resulted in a calculated expected benefit of $123,200, resulting in an eight-level increase in Acevedo's total offense level.

Acevedo first attacks the district court's finding by arguing that, although the Judge may have expected an appellate judgeship, that expectation was not reasonable. The district court found otherwise, and we see no clear error. The appellate judgeship was a centerpiece of the bribe -- the Judge stated that he would not otherwise participate in the conspiracy, "not even for $100,000." In addition, all parties took steps to facilitate the Judge's appointment. Acevedo coordinated two meetings between the Judge and Hernández, a key fundraiser for the then governor-elect. The Judge took steps to attend the first meeting, at a golf tournament, and he subsequently met Hernández at Hernández's

-8-

home. It is true that there is no evidence that the Judge applied for an appellate judgeship, but there is substantial circumstantial evidence of the Judge's expectations. The district court therefore did not clearly err in finding that the Judge reasonably expected that Acevedo would procure an appellate judgeship for him.

Acevedo also argues that all the Judge could have reasonably expected to obtain was assistance in acquiring an appellate judgeship, not the judgeship itself. He therefore reasons that the Government was required to prove the value of the assistance, which was necessarily less than the full value of the appellate judgeship, and that it did not do so. For support, Acevedo cites United States v. Fitzhugh, 78 F.3d 1326 (8th Cir. 1996) and United States v. White Eagle, 721 F.3d 1108 (9th Cir. 2013), in which those circuits held that, where a loan is obtained by a bribe, "its value will typically be the difference between the actual cost of the loan, and the cost of the same loan at fair market terms and conditions." White Eagle, 721 F.3d at 1122 (quoting Fitzhugh, 78 F.3d at 1331). Those cases are inapplicable. A loan requires repayment, and so its face value is not a good indicator of the benefit conferred. Acevedo's offer to get the Judge appointed to an appellate judgeship did not have this type of offset. As stated above, the Judge reasonably believed that

-9-

Acevedo could get him appointed. Thus, the record supports the conclusion that what the Judge intended to obtain was an appellate judgeship. While the defendant argues he merely offered "assistance," that argument does not suffice to show that the district court erred in concluding that the Judge intended to obtain something more.

The district court therefore did not err in applying an eight-level increase to Acevedo's offense level.

**B. The District Court Did Not Err By Finding That the Criminal Activity Involved Five or More Participants**

The district court also increased Acevedo's total offense level by four levels because it found he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). We review the district court's determination that an individual was a participant for clear error. See United States v. George, 841 F.3d 55, 66, 69-70 (1st Cir. 2016).

A participant is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. n.1. To be considered a participant, it is only necessary that an individual gives knowing aid in some aspect of the criminal activity. George, 841 F.3d at 70 (citing United States v. Starks, 815 F.3d 438, 441 (8th Cir. 2016)); United States v. McCormick, 773 F.3d 357, 360 (1st Cir.

-10-

2014). Similarly, an individual can be considered a participant when his or her acts "give rise to an inference of complicity sufficient to ground a finding that [the individual] was a participant in the criminal activities." George, 841 F.3d at 70.

Acevedo concedes that he and three others were criminally responsible participants, but he contends that the district court erred in finding that Bebé, Saúl, Miguel, and Hernández were also criminal participants. We find that there is sufficient evidence to establish that Saúl was a participant, and thus need not address whether any of the others were participants.

Other circuits have affirmed a finding that an individual was a criminal participant under circumstances similar to Saúl's. In United States v. Saulter, an individual called "Judo" played a small role in a larger drug transaction by helping a criminal informant locate the defendant to conduct the transaction. 60 F.3d 270, 280-81 (7th Cir. 1995). There was also disputed evidence, credited by the district court, that Judo handed the informant cocaine. Id. at 281. The Seventh Circuit held that "Judo's assistance in locating [the defendant] to perform an act in furtherance of the conspiracy" combined with handling cocaine established Judo as a criminally responsible participant for the purposes of § 3B1.1(a). Id.

In a second case, the defendant paid false invoices to a car dealer who leased cars to the New York City Transit Police Benevolent Association (the "TPBA"), which enabled "selected TPBA members . . . to buy cars at discounted prices from the auto dealer as a direct result of [the defendant's] larceny from the TPBA." United States v. Zichettello, 208 F.3d 72, 108 (2d Cir. 2000). The defendant argued that none of the TPBA members were criminal participants. Id. at 108. The Second Circuit ruled that "the district court had an evidentiary basis to conclude that at least one of these individuals was criminally involved in [the defendant's] scheme." Id. It reasoned that the TPBA Recording Secretary, who purchased a car from the dealership at an 80% discount, "had to have known from the size of the discount that some illegitimate quid pro quo involving the TPBA Treasurer was the catalyst for the transaction." Id. That knowledge, and the benefits the TPBA Recording Secretary received, were sufficient under the clear error standard "to render the TPBA Recording Secretary a participant and to justify the enhancement." Id.

Acevedo acknowledges that Saúl set up the initial meeting between Lito and the Judge. Saúl then attended meetings for nearly six months where Lito would pay for outings at restaurants and bars with money provided by Acevedo. The Judge requested that Acevedo secure employment at the Treasury

-12-

Department for Saúl, and Saúl gave the Judge his résumé, which the Judge passed on to Lito. When Acevedo was slow in obtaining the position for Saúl, Saúl confronted Acevedo at Acevedo's office, where Acevedo requested more time. While Saúl waited on his job, Lito employed him, and Saúl "was given money to repair his vehicle and cash whenever [he] needed."

Given these facts, the district court did not clearly err by finding that Saúl facilitated, knew of, and benefitted from the criminal activity. Saúl initiated conversations between Lito and the Judge, thus providing "assistance in locating [a co-conspirator] to perform an act in furtherance of the conspiracy". Saulter, 60 F.3d at 281. While Acevedo declares that Saúl did not know of the conspiracy and that he was not present when discussions were held, his actions, including confronting Acevedo about obtaining a government job, show that Saúl "had to have known . . . that some illegitimate quid pro quo involving [the defendant] was the catalyst" for the benefits he received or was promised. See Zichettello, 208 F.3d at 108. And, as previously described, Saúl was promised a job, given money, and enjoyed outings paid for with money provided by Acevedo as part of the criminal activity. These facts provide sufficient evidence that Saúl was a criminally responsible participant under U.S.S.G. § 3B1.1(a).

-13-

Because adding Saúl makes five participants, we need not examine the other three individuals the district court identified, nor do we need to reach the district court's alternative holding that the criminal activity was "otherwise extensive."

**C.  The District Court Followed the Preferred Methodology When It Determined Acevedo's Sentence**

Acevedo contends that his sentence was procedurally unreasonable because the district court "reversed the required sequence" of analytical steps when it determined his sentence. Claims of procedural unreasonableness in sentencing are typically reviewed for abuse of discretion.  United States v. Dávila-González, 595 F.3d 42, 47 (1st Cir. 2010).

We reaffirmed the recommended method for determining a sentence in Dávila-González:

> [A] sentencing court ordinarily should begin by calculating the applicable guideline sentencing range; then determine whether or not any departures are in order; then mull the factors delineated in 18 U.S.C. § 3553(a) as well as any other relevant considerations; and, finally, determine what sentence, whether within, above, or below the guideline sentencing range, appears appropriate.

Id. at 46 (quoting United States v. Pelletier, 469 F.3d 194, 203 (1st Cir. 2006)).

Acevedo protests that the district court did not follow this method, but instead began by determining that the maximum sentence was necessary.  To support his argument, Acevedo points

-14-

to a single statement by the district court at the sentencing hearing:

> Every single time that I looked at this case, every time I evaluated the evidence I was convinced that one, the guidelines would not be representative and no other sentence than the maximum sentence was warranted in your case. The maximum sentence in your case is that of ten years. But actually I am aware that I have to consider some other factors . . . .

Acevedo disregards all of the deliberation that preceded this excerpt, however. In fact, the district court first calculated Acevedo's recommended sentencing range. It then considered possible grounds for departure, and weighed relevant § 3553(a) factors. As part of its § 3553(a) conduct, the district court considered some of Acevedo's previous conduct, relevant to, for example, his "history and characteristics." See 18 U.S.C. § 3553(a). Finally, it imposed its sentence, during which it made the statement plucked out by Acevedo. That is the recommended procedure, and so the district court's methodology was not erroneous.

## D. The District Court Did Not Abuse Its Discretion By Considering Evidence of Acevedo's Prior Acts

Acevedo contends that the district court used unreliable evidence to vary his sentence. In particular, he challenges the court's findings regarding an incident at the Mesa Criolla Restaurant (the "Mesa Criolla Incident"), including the district court's consideration of a letter sent by an off-duty police

-15-

officer who was present at the incident,[4] and a second incident in which Acevedo threatened his cousin, Rafael Lorenzo-López ("Rafi"). We "examin[e] the district court's findings of fact for clear error."[5] United States v. Carpenter, 781 F.3d 599, 608 (1st Cir. 2015).

## 1. The Mesa Criolla Incident

Paragraph 129 of the PSR described the Mesa Criolla Incident:

> According to the investigative agents, in the event known as the Mesa Criolla Incident, on August 23, 2010, at 1:17 am at [M]esa Criolla Restaurant in Moca, PR, video documentation displays the defendant brandishing a firearm to Orlando Soto, owner of the restaurant, and Steven P[é]rez-H[é]rnandez, employee, after a verbal altercation. A day after the incident, Orlando Soto alleged that two individuals, Eliezer Vega Mercado and Elliot Medina Pellot, entered his business and assaulted him on behalf of the defendant.

At Acevedo's pretrial detention hearing, the Assistant United States Attorney (the "AUSA") proffered evidence about the

---

[4] Although the district court discussed the letter, it also stated that, even without the letter, "the full record of the evidence at trial depicting [Acevedo's] character . . . shows [the] same characteristics and pattern of conduct." Thus, the district court made clear that it would have reached the same sentence without the letter. Any error in admitting the letter would therefore be harmless, so we do not delve into the letter's reliability. See Fed. R. Crim. P. 52(a).

[5] The Government argues that plain error review applies because Acevedo did not argue below that the evidence was unreliable. Because the result would be the same under either clear error or plain error review, we do not address this contention.

Mesa Criolla Incident.  The proffer included that Acevedo got into a fight with an off-duty police officer at the Mesa Criolla Restaurant.  After the officer left, the restaurant's owner asked Acevedo to leave.  Acevedo then brandished a gun and threatened to kill the owner and an employee.  An employee disarmed Acevedo, but Acevedo later returned and demanded the restaurant's surveillance footage.  When the owner refused, Acevedo threatened him and left.  Three men then came to the restaurant, asked the owner "whether he was the one that had the problem with [Acevedo]," then beat the owner.  The proffer was supported by photographs of the owner's face and videotape of the beating.

Two men pled guilty to assault related to this incident. In addition, Acevedo was charged in connection with the Mesa Criolla Incident, but all charges were dismissed.

## 2.  The Altercation with Rafi

Paragraph 130 of the PSR stated that Acevedo "was involved in an altercation with [his cousin Rafi], in which [Acevedo] brandished a firearm.  Subsequently, [Acevedo] made life threats via text messages against his cousin, who ultimately abandoned the jurisdiction for fear of death."

Rafi also testified about this incident at the Judge's trial.  Relying on Rafi's testimony, the district court found that Acevedo "pulled a gun and pointed it at [Rafi] while threatening

-17-

to kill him." Rafi subsequently filed a complaint with the state police, and Acevedo's relative, a police lieutenant, tried to convince Rafi not to pursue the complaint. That night, Acevedo "began to send threatening [text] messages" to Rafi, including threatening to take Rafi's son. Eventually, Acevedo purchased a plane ticket for Rafi to leave Puerto Rico, and the complaint was dismissed because Rafi was not present to press charges.

### 3. The Reliability of the Evidence

The district court relied on these two incidents as evidence of Acevedo's history of violence, threats, and efforts to silence witnesses. Acevedo argues that the "negative conclusions [the district court] drew" from these incidents were erroneous because the evidence for these incidents was unreliable. The evidence for the Mesa Criolla Incident "rested largely on out-of-court statements never subject to adversarial testing." Similarly, evidence from the detention hearing concerning Acevedo's altercation with Rafi was "not subject to adversarial testing," and Rafi's testimony at the Judge's trial about the incident was unreliable because Rafi was cross-examined "with the express purpose of casting Acevedo in the worst light possible."

As an initial matter, Acevedo did not object to the summaries of these two incidents in the PSR, so the district court could treat those facts "as true for sentencing purposes." United

-18-

States v. Ocasio-Cancel, 727 F.3d 85, 91-92 (1st Cir. 2013) (upholding a district court's findings where "the defendant did not object to any aspect of the PSI Report's discussion of local charges against him that were ultimately dismissed"). The district court did, however, find additional facts related to those incidents, so we will address Acevedo's arguments.

Much of the evidence presented at Acevedo's sentencing hearing was the hearsay proffer of the AUSA. "[T]he sentencing court has broad discretion to accept hearsay evidence at sentencing so long as the court supportably concludes that the information has sufficient indicia of trustworthiness to warrant a finding of probable accuracy." United States v. Rodríguez, 336 F.3d 67, 71 (1st Cir. 2003). Indicia of trustworthiness can include corroboration by other evidence. United States v. Ramírez-Negrón, 751 F.3d 42, 52 (1st Cir. 2014) ("[T]he hearsay testimony was corroborated by . . . [the agent's] personal knowledge and observation of the videos."); United States v. Mara, 523 F.3d 1036, 1039 (9th Cir. 2008) ("[T]he statements contained in the [police] report were sufficiently corroborated so as to provide the requisite indicia of reliability."). We have similarly allowed reliance on an AUSA's proffer that, "though uncorroborated, was thorough and replete with details." Rodríguez, 336 F.3d at 71.

Here, corroborating evidence presented at the detention hearing concerning the two incidents included text messages, live testimony, photographs, video, and court records. It is true that much of the evidence was not subject to cross-examination, but "the sentencing court may rely upon 'virtually any dependable information,' including statements which have not been subjected to the crucible of cross-examination." United States v. Doe, 741 F.3d 217, 236 (1st Cir. 2013) (quoting United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010)). "Even conduct that did not lead to a conviction may be considered." United States v. Hinkley, 803 F.3d 85, 92-93 (1st Cir. 2015).

Acevedo's contention that the district court erred by relying on Rafi's testimony from the Judge's trial fails for the same reason. Although Rafi's testimony may not have been subject to the type of cross-examination that Acevedo would have preferred, that is not fatal in and of itself. See Doe, 741 F.3d at 236. In addition, Rafi's testimony about his altercation with Acevedo was consistent with the AUSA's proffer at the detention hearing, and so corroborated by the same evidence. Finally, "the sentencing judge was also the presiding judge during [all of] the prior proceedings. Thus, the sentencing judge had the opportunity to observe the testimony and cross-examination of the various witnesses and could thereby make an independent assessment as to

their credibility." United States v. Zuleta-Álvarez, 922 F.2d 33, 37 (1st Cir. 1990).

The district court therefore did not clearly err in finding that Acevedo was involved in these two incidents and that they supported an upwardly variant sentence.

**E.    The District Court Was Not Required to Inform Acevedo That It Intended to Rely on Evidence from Acevedo's Detention Hearing and Public Corruption Statistics**

A sentencing court "must allow the parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence." Fed. R. Crim. P. 32(i)(1)(C). "[A] defendant's right to respond to the information offered against him at sentencing means very little without a right to notice of that information." United States v. Millán-Isaac, 749 F.3d 57, 70 (1st Cir. 2014); see also United States v. Berzon, 941 F.2d 8, 18 (1st Cir. 1991) ("Th[e] right to be heard has little reality or worth unless one is informed." (quoting Burns v. United States, 501 U.S. 129, 136 (1991))).

Citing Millán-Isaac and Berzon, Acevedo first contends that the district court was required to give him notice, before his sentencing hearing, that it intended to rely on evidence presented at Acevedo's detention hearing, particularly with regards to the Mesa Criolla Incident. In Millán-Isaac, we held that it was plain error for the district court to consider either

-21-

victim-impact information presented by the government for the first time at the defendant's hearing or additional facts about the defendant presented at a co-defendant's separate sentencing hearing. 749 F.3d at 73. Similarly, in Berzon, we rejected the government's argument that the defendant had "constructive notice" that the district court might consider testimony from a co-defendant's prior sentencing hearing. 941 F.2d at 17-21.

Acevedo's argument, however, hinges on his assertion that he had no notice that the district court might rely on information from the detention hearing. A sentencing court has a "wide scope" of discretion to consider evidence, including testimony from outside the sentencing hearing if it "timely advise[s the defendant] in advance of sentencing that it heard or read, and was taking into account, that testimony." Id. at 21. Here, the PSR included a summary of the Mesa Criolla Incident, and it specifically referenced evidence from Acevedo's detention hearing when discussing his altercation with Rafi. In Berzon, we "agree[d] entirely" with two cases from other circuits that allowed sentencing courts to consider evidence presented in related trials because those defendants' pre-sentence reports contained those same facts, thus putting the defendants on notice that those facts might be used. 941 F.2d at 19 (citing United States v. Notrangelo, 909 F.2d 363 (9th Cir. 1990) and United States v. Romano, 825 F.2d

-22-

725 (2d Cir. 1987)).  In addition, the detention hearing was part of the record.  Thus, although the PSR did not contain all of the specific facts discussed by the district court, its summary of the two incidents, its mention of the detention hearing, and the fact that the detention hearing was part of the record gave Acevedo all the notice he needed that the district court might rely on evidence presented at his detention hearing.

Acevedo also argues that the district court did not give him prior notice of its intent to rely on public corruption statistics.  Our holding in United States v. Curran governs sentencing courts' use of documents to which Federal Rule of Criminal Procedure 32 does not apply -- that is, documents outside of the PSR.  926 F.2d 59, 63 (1st Cir. 1991).  There, we held that sentencing courts considering documents of that sort "should either make clear that the document is not being used for its factual content, or should disclose to the defendant as much as was relied upon, in a timely manner, so as to afford the defendant a fair opportunity to examine and challenge it."  Id. at 63.  Here, the district court did neither.

However, Acevedo has not shown that any harm or prejudice resulted from the court's use without notice of these statistics at sentencing.  Nor has he otherwise suggested that the statistics are in any way problematic.  He does argue that the statistics

-23-

"pertain to public corruption in general," rather than judicial corruption specifically. Yet, this argument is meritless, as his offenses of conviction are not specific to judicial corruption, and he fails to explain why considerations of public corruption generally are inapplicable. Therefore, while the district court should have provided notice to Acevedo that it intended to use the statistics in question, its failure to do so amounts only to harmless error. See United States v. Warr, 530 F.3d 1152 (9th Cir. 2008) (finding harmless error when the district court relied on a recidivism study without providing prior notice to the defendant, but only cited that study for the "common sense proposition that younger offenders are likely to recidivate").

**F.  The District Court Imposed a Variance, Not a Departure**

Acevedo's final claims of error rest on his contention that the district court imposed a "departure in the guise of a variance." Building on this assertion, he argues that the district court (1) relied on improper grounds for imposing the departure, and (2) did not allow his counsel an adequate opportunity to argue why those grounds were improper. We can cut these arguments off at the root. Although the district court did discuss a departure under U.S.S.G. § 5K2.7, it specifically stated that it "did not apply the departure" but instead found that "a variance [was] applicable." In doing so it considered numerous

-24-

factors under 18 U.S.C. § 3553(a), "the hallmark of a variance." United States v. Santini-Santiago, 846 F.3d 487, 491 (1st Cir. 2017). Some of the factors it considered might also relate to a departure, but a sentencing court may "echo" a departure consideration as one factor in its analysis, while still imposing a variance. United States v. Aponte-Vellón, 754 F.3d 89, 93 (1st Cir. 2014).

For the same reason, Acevedo's assertion that he was not allowed a proper opportunity to object to the imposition of a departure, even if it had merit, would not require reversal. The district court imposed a variance, not a departure, and so any error would be harmless. See Fed. R. Crim. P. 52(a).

### III.  CONCLUSION

Considering the serious and corrosive nature of Acevedo's crimes, it would have been more than appropriate for the district court to have imposed an even higher sentence. For the reasons stated, we affirm Acevedo's sentence.

**Affirmed.**