**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0258n.06

**No. 19-1146**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
May 07, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| DEAN REYNOLDS, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE:** CLAY, COOK, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Defendant-Appellant Dean Reynolds appeals his 204-month sentence, arguing that the district court erroneously calculated his Guidelines range, sentenced him disproportionately compared to other similarly situated defendants, and imposed a higher sentence as punishment for Reynolds electing to go to trial. We AFFIRM.

**I.**

Reynolds was elected as a Clinton Township trustee in 2004 and was reelected in 2008 and 2012. Trustees in Clinton Township operate much like city councilmembers in a city. Clinton Township had four trustees, who together with the township supervisor, treasurer, and clerk, constituted the Clinton Township Board of Trustees (Board), which voted on legislation and approved contracts. Approval of a contract required a simple majority, or four of seven votes. In 2015, the FBI began investigating Reynolds for public corruption. The investigation ultimately led to his indictment for receiving and soliciting bribes from local contractors.

One of the local contractors was Rizzo Environmental Services (Rizzo), a garbage company that won the garbage contract with Clinton Township in 2010. From 2005-2010, the contract was awarded to a different contractor, Waste Management. Bill Sowerby, who at the time was the treasurer of Clinton Township, testified that as the Waste Management contract's expiration date approached, Reynolds supported awarding an extension to Waste Management without putting the contract through a competitive bid process. Reynolds also spoke out negatively about Rizzo, expressing concerns that Rizzo was not friendly to its employees. Rizzo ultimately submitted the low bid on the 2010 garbage contract, and all Board members, including Reynolds, eventually voted in favor of approving the contract with Rizzo.

The 2010 contract was set to expire in 2014. In the summer of 2013, the Board's Refuse Committee unanimously recommended that the Township seek bids from other garbage contractors for a subsequent garbage contract, consistent with the Board's standard practice. However, when it came time for the Board to vote on the recommendation, Reynolds made a motion to award an extension to Rizzo, which was approved 4-3 (2014 contract). Sowerby "was shocked by the motion and the support of that motion" given the unanimous vote by the Refuse Committee and the Board's usual practice of seeking competitive bids. R. 264, PID 3342. The 2014 contract was originally set to expire in November 2018.

The FBI obtained a wiretap on Reynolds's phone in July 2015, and later on the phone of Rizzo CEO Chuck Rizzo. Through those wiretaps, the FBI learned that Reynolds was receiving bribes from Chuck Rizzo in the form of cash payments and payments made to Reynolds's divorce lawyers. Additionally, Chuck Rizzo agreed to pay for Reynolds's psychiatric examination for his divorce proceeding. To disguise the payment, Reynolds asked a friend to sign a fake promissory note, which Reynolds's best friend, Angelo Selva, drafted for him. In exchange for these

payments, Reynolds agreed to secure another contract extension for Rizzo. That extension was unanimously approved in February 2016 (2016 contract) and had a ten-year term, but also contained a clause allowing the Township to opt out of the 2016 contract after December 31, 2018.

Reynolds was arrested in October 2016. According to Selva, shortly after Reynolds was released, Reynolds asked Selva to destroy the fake promissory note that Selva had drafted and any other incriminating evidence. Reynolds also discussed the charges against him with Selva and maintained that he was innocent because all of the funds he received from Rizzo were legitimate loans. Selva was stunned by Reynolds's denial because Selva had discussed the true nature of the bribes and had helped to create a fake promissory note to obscure one of the bribes. Selva did not destroy the evidence, and within the next few days, Reynolds's attorney called Selva and told him not to destroy evidence.

The Tenth Superseding Indictment charged Reynolds with fourteen counts of bribery or conspiracy to commit bribery concerning programs receiving federal funds. The charges stemmed from the Rizzo contracts discussed above and bribes for other contracts that are not relevant to this appeal. A jury convicted Reynolds of all counts.

The probation office prepared a presentence investigation report (PSR). As relevant here, the PSR recommended that Reynolds's offense level be increased by sixteen levels under United States Sentencing Guideline (U.S.S.G.) § 2C1.1(b)(2) because "the benefit received or to be received in return for the" bribes exceeded $1.5 million. The PSR calculated the benefit to be received by relying on a 5.1% profit margin applied to the value of the 2014 and 2016 Rizzo contracts, which was derived from an income statement submitted by the garbage contractor for 2015 and 2016. In an addendum to the PSR, the probation office also noted that the government requested a two-level obstruction-of-justice enhancement based on Selva's testimony that

Reynolds asked him to destroy incriminating evidence, but concluded that the district court needed to make that determination because the probation office had not observed Selva's testimony.

Reynolds objected to the sixteen-level increase under U.S.S.G. § 2C1.1(b)(2), arguing in part that profits from the 2016 contract should not be included after December 31, 2018, due to the opt-out clause in the 2016 contract. At the sentencing hearing, the district court accepted the PSR's calculations and overruled Reynolds's objection. It also determined that Selva's testimony was credible and applied the obstruction-of-justice enhancement. With a total offense level of thirty-eight and a criminal history category of I, Reynolds's Guidelines range was 235-293 months. The district court imposed a below-Guidelines sentence of 204 months' imprisonment.

Reynolds now appeals.

## II.

### A. The Benefit to Be Received Under U.S.S.G. § 2C1.1(b)(2)

Reynolds first argues that the district court miscalculated his Guidelines range by erroneously attributing more than $1.5 million in expected benefit to his bribery schemes. A claim that a district court miscalculated the Guidelines is a challenge to the procedural reasonableness of a sentence. *See, e.g.*, *United States v. Young*, 847 F.3d 328, 370 (6th Cir. 2017).

We review a district court's sentence "under a deferential abuse-of-discretion standard" for procedural and substantive reasonableness. *United States v. Albaadani*, 863 F.3d 496, 504 (6th Cir. 2017) (quoting *United States v. Solano-Rosales*, 781 F.3d 345, 351 (6th Cir. 2015)). When considering procedural reasonableness, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Young*, 847 F.3d at 370 (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). A district court's

interpretation of the Guidelines is a legal question reviewed de novo, *United States v. Duke*, 870 F.3d 397, 401 (6th Cir. 2017), whereas a district court's determination about "the amount of benefit to be received" under U.S.S.G. § 2C1.1(b)(2) is an issue of fact subject to clear-error review, *United States v. Gray*, 521 F.3d 514, 542-43 (6th Cir. 2008).

Where an argument as to a Guidelines calculation is not raised in the district court, "this Court reviews the application of a particular provision for plain error as long as the district court concluded the sentencing proceedings, as it did in this case for [Reynolds], by asking the *Bostic* question." *United States v. Ramer*, 883 F.3d 659, 684 (6th Cir. 2018) (citation omitted). Plain error is "(1) error (2) that was obvious or clear, (3) that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (internal quotation marks and citation omitted).

U.S.S.G. § 2C1.1, entitled "Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right; Fraud Involving the Deprivation of the Intangible Right to Honest Services of Public Officials; Conspiracy to Defraud by Interference with Governmental Functions" provides, in part:

> **(a)** Base Offense Level:
> > **(1)** 14, if the defendant was a public official; or
> > **(2)** 12, otherwise.
> **(b)** Specific Offense Characteristics
> > **(1)** If the offense involved more than one bribe or extortion, increase by 2 levels.
> > **(2)** If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

**(3)** If the offense involved an elected public official or any public official in a high-level decision-making or sensitive position, increase by 4 levels. If the resulting offense level is less than level 18, increase to level 18.

Relevant commentary provides:

2. **More than One Bribe or Extortion.--**Subsection (b)(1) provides an adjustment for offenses involving more than one incident of either bribery or extortion. Related payments that, in essence, constitute a single incident of bribery or extortion (e.g., a number of installment payments for a single action) are to be treated as a single bribe or extortion, even if charged in separate counts.

In a case involving more than one incident of bribery or extortion, the applicable amounts under subsection (b)(2) (i.e., the greatest of the value of the payment, the benefit received or to be received, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government) are determined separately for each incident and then added together.

3. **Application of Subsection (b)(2).--**"Loss", for purposes of subsection (b)(2), shall be determined in accordance with Application Note 3 of the Commentary to § 2B1.1 (Theft, Property Destruction, and Fraud). The value of "the benefit received or to be received" means the net value of such benefit. Examples: (A) A government employee, in return for a $500 bribe, reduces the price of a piece of surplus property offered for sale by the government from $10,000 to $2,000; the value of the benefit received is $8,000. (B) A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000. Do not deduct the value of the bribe itself in computing the value of the benefit received or to be received. In the preceding examples, therefore, the value of the benefit received would be the same regardless of the value of the bribe.

U.S.S.G. § 2C1.1 comment nn.2-3.

U.S.S.G. § 2B1.1(b)(1)(H)-(I) provides a fourteen-level increase where the benefit to be received exceeds $550,000 but is less than or equal to $1.5 million, and a sixteen-level increase where the benefit to be received exceeds $1.5 million but is less than or equal to $3.5 million.

The district court accepted the PSR's recommendation and found that "the benefit received or to be received" was greater than $1.5 million by applying a 5.1% per-year profit margin to the value of the 2014 and 2016 Rizzo contracts. A 5.1% profit amounts to $181,700 per year.

Reynolds first argues that the district court erroneously applied the 5.1% profit to the full term of the 2016 contract. He asserts that the "the benefit received or to be received" should be limited to the profits earned as of December 31, 2018, because the 2016 contract allowed the Township to opt out of the contract for any reason after that date upon providing a 120-day notice to the contractor. In Reynolds's view, because the Township has the sole discretion whether to continue performing the contract and thus whether to continue providing a benefit to the contractor—even after Reynolds was convicted and incarcerated—there is "an insufficient nexus between [Reynolds's] criminal conduct and the benefit received or to be received." Appellant's Br. at 17.[1] Reynolds cites no caselaw for his argument.

In response, the government cites to a series of cases for the proposition that "§ 2C1.1 does not require that the bribing party actually receive the benefit for which it provided the bribe." Appellee's Br. at 23. In *United States v. Chmielewski*, 196 F.3d 893, 894 (7th Cir. 1999), the defendant's sentence was enhanced for bribing officials to wipe out a $35,000 fine for a willful OSHA violation. The defendant argued that the "benefit received or to be received" was only $6,000 because, at the time he made the bribe, his attorney had supposedly worked out a deal to resolve the violations for a $6,000 fine. *Id.* The Seventh Circuit rejected the argument, explaining that

> [e]ven if Chmielewski's attorney had worked out a deal by then to wrap up the violations for only $6,000, the evidence clearly suggests that Chmielewski himself was not up to speed on those negotiations, for his recorded conversations demonstrate that he paid $2,000 to wipe away the $35,000 'willful' penalty. Therefore, it was not clearly erroneous for the judge to have found that when the money changed hands the 'benefit' Chmielewski thought he was receiving—and

---

[1] Reynolds also argues that there was no loss to the government from his offense because there is evidence that the contract with Rizzo was far better than any other contract the Township could obtain today. Even if true, Reynolds's argument does not bear on the Guidelines calculation because U.S.S.G. § 2C1.1(b)(2) expressly directs the court to consider "whichever is greatest" of "the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense." Here, because the "benefit received or to be received" is greater than "the loss to the government from the offense," the latter is irrelevant.

> that's all that is necessary for the § 2C1 enhancement to kick in—was worth at least $35,000.

*Id.* at 894-95.

In *United States v. Acevedo-Lopez*, 873 F.3d 330, 333-34 (1st Cir. 2017), the defendant bribed a judge for favorable treatment in a criminal case in exchange for assisting the judge in obtaining an appellate judgeship. The district court calculated the benefit to be received as the increased salary from an appellate judgeship until the judge would have reached the mandatory retirement age, despite the fact that the judge never applied for an appellate judgeship. *Id.* at 335-36. The First Circuit rejected the defendant's argument that the judge's expectation of an appellate judgeship was not reasonable because "all parties took steps to facilitate the Judge's appointment," and held that the district court did not clearly err in concluding that "the Judge reasonably expected that Acevedo would procure an appellate judgeship for him." *Id.* at 336.

In *United States v. Blagojevich*, 794 F.3d 729, 743 (7th Cir. 2015), the Seventh Circuit quickly disposed of the former Illinois governor's argument that the district court erred in enhancing his sentence based on a loss or value of $1.5 million, where recordings indicated that the defendant asked supporters of a potential Senate appointee for that amount: "That nothing came of these overtures does not affect the calculation of loss under § 2C1.1(b)(2), because it is an amount Blagojevich intended to receive from criminal conduct even though not a sum anyone else turned out to be willing (or able) to pay."

The government argues that the above caselaw defeats Reynolds's argument that he should not be held responsible for a benefit to be received of over $1.5 million: "When Rizzo bribed Reynolds to obtain his favorable treatment on the 2016 contract, the purpose was to receive a ten-year contract, and the profits that were to come with that contract." Appellee's Br. at 26. The government points out that the witnesses who testified about the 2016 contract referred to it as a

single contract, rather than two distinct contracts (one through 2018, the remainder as possibly extending until 2026) the way Reynolds characterizes it now. Further, the government observes that no bribe is certain: "Entities can go bankrupt and be unable to comply with a contract; parties receiving bribes can renege on the deal; or law enforcement can intervene early in the crime and prevent the deal from going through." Appellee's Br. at 23-24.

Reynolds responds that the cases cited by the government are distinguishable because none involves a contract with an opt-out clause, as here. Rather, the cases involved situations where the benefit was calculated based on what the benefit would have been had the scheme worked (e.g., the value of an appellate judgeship), or the value of something the defendant demanded (*Blagojevich*) or thought he was receiving (*Chmielewski*). Here, Reynolds points out that the bribe was completed and resulted in an actual extension being approved, but argues that the value of the extension, and thus the benefit to be received from the bribe, is speculative because the Township can opt out at any time.

The district court, however, noted that Reynolds himself argued that it is highly unlikely that the opt-out clause will be utilized because the terms are so favorable to the Township, and thus the contract will likely remain in effect until 2026. Further, the government introduced evidence at trial that Reynolds and Chuck Rizzo discussed the opt-out clause and that Reynolds offered to "get rid of that provision" if Chuck Rizzo helped him get elected as Township Supervisor by providing campaign funds. R. 264, PID 3495-96. Accordingly, even if we were inclined to find that a contract with an opt-out clause does not necessarily provide a benefit for the entire term of the contract, under the circumstances of this case—where the contract will almost certainly be in effect for the full ten-year term and where there was evidence that Reynolds solicited bribes in

exchange for getting rid of the opt-out clause—the district court did not clearly err in including the profits from the full ten-year term of the 2016 contract in its benefit calculation.

Reynolds also argues that the district court erred in including profits received from the 2014 contract in its benefit calculation because the evidence was insufficient to conclude that Reynolds accepted or solicited a bribe for the 2014 contract. As an initial matter, the government argues that plain-error review applies to this issue because Reynolds did not raise the argument below. Although Reynolds disputes that plain-error review applies, he did not raise this issue with the district court. Therefore, we review for plain error. *See Ramer*, 883 F.3d at 684.

Reynolds argues there is "no evidence presented either at trial or at sentencing that Defendant solicited or accepted any bribes from Rizzo Environmental Services prior to the approval of the [2014 contract] on March 10, 2014." Appellant's Br. at 21. Reynolds's argument is unpersuasive. It is true, as Reynolds argues, that Angelo Selva's testimony—that he became aware of Reynolds taking bribes from Rizzo "probably some time in 2014," R. 249, PID 2822— is not very specific, and would likely be insufficient on its own to establish that Reynolds solicited or received bribes prior to the 2014 contract. However, the government correctly points out that there was other evidence, which Reynolds does not meaningfully address. *See* Reply Br. at 8-9 (acknowledging the other evidence but arguing in conclusory fashion that the evidence was still "not sufficient"). First, Selva testified that Reynolds had a long history of taking bribes. Second, Bill Sowerby, the then-Treasurer of Clinton Township who had a vote on the Rizzo contracts, explained that Reynolds opposed awarding the contract to Rizzo in 2010 but inexplicably changed course and led a motion to extend the Rizzo contract in 2013 without seeking other bids, which was contrary to the typical practice of the Board. Finally, Chuck Rizzo's plea agreement stated that "from 2012 through January 2016, [Chuck Rizzo] agreed to pay money or to provide things

of value to Dean Reynolds." R. 130, PID 699. Given this evidence, the district did not plainly err in concluding that Reynolds received bribes in exchange for supporting the award of the 2014 contract to Rizzo.

Finally, Reynolds argues that the district court incorrectly calculated the profit for the years following 2016. The entirety of his argument on this point is as follows:

> In calculating the benefit received or to be received for purposes of applying the enhancement set forth in 2B1.1(b)(1), the only evidence before the court was the profit and loss sheets for 2015 and 2016 admitted into evidence at sentencing. Since the [2016 contract] expressly provided that the contract did not "include any allowance for a fuel escalation or fuel cost adjustment" it cannot be stated with any degree of certainty that the profit did not decrease in the years 2017 and 2018.

Appellant's Br. at 22. Reynolds did not argue this point below and his brief reference to this issue on appeal does not establish plain error. We have explained that the amount of the benefit to be received "need not be determined with precision," and the defendant "must carry the heavy burden of persuading this Court that the evaluation of the loss was not only inaccurate, but outside the realm of permissible calculations." *Gray*, 521 F.3d at 542-43 (internal quotation marks and citations omitted). Reynolds's argument here does not meet that standard. Further, because Reynolds offers no other reasonable calculation of the profits to Rizzo, it is not clear that an alternative calculation would have lowered the benefit amount from the 2014 and 2016 contracts to below $1.5 million, and thus he has not established that any error would have affected his substantial rights.

In sum, the district court did not clearly err in finding that the "benefit received or to be received" exceeded $1.5 million.

## B. The Obstruction-of-Justice Enhancement

U.S.S.G. § 3C1.1 provides for a two-level enhancement where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with

respect to the investigation, prosecution, or sentencing of the instant offense of conviction," if the "obstructive conduct related to" the "offense of conviction and any relevant conduct" or "a closely related offense." The district court found that this enhancement applies based on Angelo Selva's testimony that after Reynolds was arrested, Reynolds asked Selva to destroy incriminating evidence, including a fake promissory note. We review a district court's legal conclusions as to this issue de novo and findings of fact for clear error. *See United States v. Thomas*, 933 F.3d 605, 608-10 (6th Cir. 2019).

Reynolds argues that the district court erred in crediting Selva's testimony without corroboration because Selva admitted to memory problems. Selva testified that he had diabetic neuropathy which, among other things, impacted his memory. He has "to write things down" to aid his short-term memory, and he has difficulty retrieving memories of events that occurred within the year before his testimony. R. 249, PID 2861. He explained: "If these events had taken place in the last . . . year, I would have not been able to testify. But because they took place in 2013, to 2014, 2015, I am able to testify, because I can retrieve these memories." *Id.* at PID 2861-62. Reynolds notes that the conversation in question between Reynolds and Selva supposedly took place in October 2016, which he says is "outside the scope of [Selva's] memory capabilities." Appellant's Br. at 25. But Reynolds's argument is not consistent with Selva's testimony. Selva explained that his memory of events within the year before he testified was foggy, but he testified in June 2018, nearly two years after the purported conversation. And, in any event, Selva also testified that he would be forthcoming if he could not remember something, and indeed testified on numerous occasions that he could not remember certain details. As the district court noted, Selva hinted at no such memory problems with the conversation at issue, and the district court, who observed the testimony of the witness, found Selva credible:

> I heard Selva's testimony. I was favorably impressed with it. I believe the jury was as well. He was cogent, he was spontaneous, and not hesitant in his answers, and he, when he said he did not remember a fact, he spoke up and affirmatively made that known.
>
> These were facts, though, they occurred in October, not the preceding year when he had, according to his recollection, a better recall of events back in the pre-2016, was it? Back in '15 and '14 and '13. I'm not sure about the years, but as Mr. Korn does correctly point out that the event that he spoke of with respect to destruction of evidence was about a year beyond when Selva had, himself, said he was more reliably able to retrieve memories. But the fundamental thing that I recall is, as the transcript reveals, he said when I . . . can't remember, I will just tell you. And he did.
>
> But the point is that with respect to this destruction of evidence matter, he did remember. And he said he remembered, and he gave details, and he told the jury how it happened and when it happened and, at least approximately. And what Mr. Reynolds had asked him to do, and the actions he took in pursuit of those requests.

R. 285, PID 3980-81.

Reynolds also notes that Selva testified that Reynolds's attorney called him a couple of days after Reynolds allegedly attempted to obstruct justice and instructed him "not to destroy any evidence or remove any evidence." R. 249, PID 2865. According to Reynolds, this shows that Reynolds never intended for Selva to destroy evidence. The district court rejected this argument, reasoning that another plausible explanation is that the attorney was simply trying to prevent further illegal actions, and that the additional testimony did not call into question Selva's memory of his conversation with Reynolds. Given the "great deference" afforded to a district court's credibility determinations, *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008) (internal quotation mark and citation omitted), Reynolds has not shown that the district court clearly erred in crediting Selva's testimony.

Finally, Reynolds argues that Selva's testimony is insufficient without corroboration. We have explained, however, that "[t]he credited testimony of a single witness is sufficient to support factual findings by a preponderance of the evidence on sentencing, which will survive

'clear error' review, if that evidence bears more than a 'minimum indicium of reliability.'" *United States v. Reid*, 357 F.3d 574, 582 (6th Cir. 2004) (citation omitted).

> The indicia-of-reliability standard is a "relatively low hurdle." *United States v. Moncivais*, 492 F.3d 652, 659 (6th Cir. 2007). It allows courts to consider "[a]ny information" that may be reliable. *See* U.S.S.G. § 6A1.3 cmt. (2016). And on top of that, we review those reliability decisions under the highly deferential, clearly erroneous standard. *See United States v. Gibson*, 985 F.2d 860, 864 (6th Cir. 1993).

*United States v. Armstrong*, 920 F.3d 395, 398 (6th Cir. 2019) (alteration in original).

In *Reid*, we affirmed the district court's application of a sentencing enhancement based on the testimony of a witness who "was an interested witness with a motive for seeking revenge against [the defendant]," "had a criminal record," and whose story had "some aspects" that "varied over time." 357 F.3d at 582. Selva is at least as credible as the witness in *Reid*, and the district court sufficiently explained why it believed that Selva's testimony was credible despite potential memory issues. The district court did not clearly err in crediting Selva's version of events without corroboration.

We affirm the district court's application of the obstruction-of-justice enhancement.

## III.

Next, Reynolds argues that the district court's sentence is substantively unreasonable because the district court failed to properly consider the need to avoid unwarranted sentence disparities and sentenced Reynolds to a far greater sentence than other similarly situated defendants.[2] We review a substantive-reasonableness challenge for abuse of discretion. *See*

---

[2] Although Reynolds frames this issue as a challenge to both the procedural and substantive reasonableness of his sentence, it is more appropriately viewed as a substantive argument only because he is challenging how the district court analyzed and weighed this factor, and the district court indisputably considered the factors listed in 18 U.S.C. § 3553(a) in fashioning a sentence. *See, e.g.*, *Gall*, 552 U.S. at 51 (explaining that failing to consider the § 3553(a) factors is procedurally unreasonable); *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018) (explaining that an argument that a sentence is too long due to placing too much or too little weight on a particular factor is a substantive-reasonableness challenge).

*Albaadani*, 863 F.3d at 504 (citation omitted). Because we presume that a within-Guidelines sentence is substantively reasonable, Reynolds's "task of persuading" us that his below-Guidelines sentence "is unreasonably long is even more demanding." *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008) (citation omitted).

18 U.S.C. § 3553(a) sets forth the factors district courts must consider in imposing a sentence, one of which is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). "Divergent sentences are justified, however, where defendants 'did not actually engage in the same conduct.'" *United States v. Stewart*, 628 F.3d 246, 260 (6th Cir. 2010) (quoting *United States v. Vowell*, 516 F.3d 503, 513 (6th Cir. 2008)).

As an initial matter, we have previously expressed skepticism of a defendant's challenge to a within-Guidelines sentence based on § 3553(a)(6):

> Swafford also challenges the reasonableness of his sentence, claiming it violates the requirement that courts "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). That is an unconventional ground for challenging a *within-guidelines* sentence. The point of the guidelines is to decrease sentencing disparities, an objective *furthered* by a within-guidelines sentence, as opposed to a sentence that varies above or below the advisory guidelines range. The very thing Swafford presumably wants—a below-guidelines sentence—is more likely to create disparities than eliminate them. There is nothing wrong, to be sure, with a below-guidelines sentence. It is just that a request for one should not turn on § 3553(a)(6).

*United States v. Swafford*, 639 F.3d 265, 270 (6th Cir. 2011). Nevertheless, Reynolds argues that his below-Guidelines sentence created an unwarranted sentence disparity with similarly situated defendants because "the national average federal sentence of defendants convicted of bribery was 29.80 months," and because the district court, in rejecting Reynolds's argument, relied on cases that were readily distinguishable from this case. Appellant's Br. at 31-41.

In rejecting Reynolds's national-average argument, the district court explained:

> I take into account . . . but reject the concept of this average sentence being something that should move the Court to a remarkably lower sentence. The problem with these kinds of averages, we just don't know enough about the details. Cooperation or not, obstructive behavior or not, longstanding association with criminal activity or not, the average, all these facts are simply melded together. They are stirred together into a -- they are virtually liquified. Nothing stands out. Nothing, no distinctive characteristics stand out that provide any particular instruction for the Court or information.
>
> Another way of thinking about that . . . is that it's a very unwise thing to set out to wade across the river the average depth of which is only 2 feet. You're probably going to be in trouble in the middle of the stream when you get to more specific information about how deep it really is. So I'm just not that moved by averages.

R. 285, PID 4016-17.

The district court also considered and discussed cases that the government cited in its sentencing memorandum. The district court explained that it found *United States v. Bolar*, 483 F. App'x 876, 878-79 (5th Cir. 2012), "instructive . . . in terms of [the defendant's] activity," R. 285, PID 4016. In *Bolar*, the district court varied upward and sentenced the defendant to 204 months' imprisonment for extortion, wire fraud, failure to file a tax return, and structuring financial transactions to evade reporting requirements. 483 F. App'x at 877, 880. The defendant, a former city councilman, engaged in "a pattern of extortion and fraud," including requiring local businessmen to make contributions to his campaign in exchange for assistance with building projects, and engaging in other outright fraud on innocent victims. *Id.* at 878-79. The Fifth Circuit affirmed the district court's upward variance—from a Guidelines range of 121-151 months to a 204-month sentence—given the defendant's egregious conduct, including "st[ealing] from the community that elected him, from church members, and from his friends who were in poor health." *Id.* at 884. Although the district court acknowledged that *Bolar* is distinguishable because the defendant in that case "was shaking down people who were otherwise innocent," the district court

found the case "instructive with respect to framing my mind for an appropriate sentence in this case." R. 285, PID 4016.

Reynolds has not met the demanding standard to establish that the district court's below-Guidelines sentence is substantively unreasonable. Although we have acknowledged that district courts may use national sentencing averages as a "starting point" to avoid unwarranted sentence disparities, *United States v. Stock*, 685 F.3d 621, 629 n.6 (6th Cir. 2012), Reynolds has not cited any case that finds a below-Guidelines sentence to be substantively unreasonable solely because the sentence is significantly longer than the national average, as here. Further, the district court considered Reynolds's argument and reasonably explained why it was discounting the national average statistics based on the particular facts of this case, including that Reynolds's criminal "behavior is not isolated and not particularly new" which led to his "remorseless behavior" in this case; that "Reynolds was described by more than one witness as a shakedown artist, and that certainly is the impression that I got"; and "[t]he damage done to county and local governments" by undermining public trust. R. 285, PID 4011-14.

Reynolds's argument that the district court improperly relied on inapposite cases in fashioning a sentence is likewise unavailing. The district court acknowledged that cases such as *Bolar* were distinguishable but nevertheless explained that they provided some guideposts for fashioning a sentence in this public-corruption case. And Reynolds has not identified a single case with similar facts that resulted in a substantially lower sentence.

The district court considered the § 3553(a) factors, including the need to avoid unwarranted sentence disparities among similarly situated defendants, and imposed a sentence that it found to be sufficient but not greater than necessary to achieve the purposes of sentencing. Although we

may have imposed a different sentence, the district court's below-Guidelines sentence is not substantively unreasonable.

## IV.

Finally, Reynolds argues that his sentence "is so disproportionate to the sentences his co-defendants received as to give rise to a presumption of vindictiveness" for Reynolds's exercising his constitutional rights not to be a witness against himself and to a jury trial, in violation of the Due Process clause. Appellant's Br. at 42-43. He therefore requests a remand for resentencing before a different district court judge. We review de novo a constitutional challenge to a sentence. *See United States v. Johnson*, 715 F.3d 179, 182 (6th Cir. 2013) (citation omitted).

Reynolds's argument that a presumption of vindictiveness applies is based on all of his co-defendants receiving sentences of sixty-six months or less—far less than his 204-month sentence. In *North Carolina v. Pearce*, 395 U.S. 711, 726 (1969), the Supreme Court applied a presumption of vindictiveness where the sentencing judge imposed a more severe sentence on a defendant after the defendant successfully appealed his initial conviction and was convicted again after retrial. In contrast, in *Alabama v. Smith*, 490 U.S. 794, 796, 798-802 (1989), where the defendant successfully appealed the denial of his motion to withdraw his guilty plea and received a far more severe sentence after being convicted by a jury, the Supreme Court held that no presumption of vindictiveness applied.

Most of the cases analyzing vindictiveness, consistent with *Pearce* and *Smith*, involve a defendant receiving a greater sentence after a successful appeal. *See, e.g.*, *United States v. Bankston*, 711 F. App'x 307, 311 (6th Cir. 2017); *United States v. Johnson*, 715 F.3d 179, 182 (6th Cir. 2013); *United States v. Jackson*, 181 F.3d 740, 744 (6th Cir. 1999). The Eighth Circuit, however, addressed a similar claim to Reynolds's here and held that no presumption of

vindictiveness applies where a defendant receives a longer sentence than his similarly situated co-defendants who pled guilty:

> It follows from *Smith* that no presumption of vindictiveness is warranted in the class of cases where a defendant who is convicted after trial alleges that "similarly situated" defendants who pleaded guilty were sentenced to lesser punishment. Even where the *very same person* receives a greater punishment after trial than after guilty plea, there is no presumption of vindictiveness. The reasons cited in *Smith* for rejecting a presumption apply at least as strongly when a defendant complains about a disparity of sentences imposed on two different people. A sentencing judge likely has more information about an offender who proceeds to trial than about a defendant who pleads guilty. And guilty pleas—as they conserve judicial and prosecutorial resources and often represent an expression of remorse and acceptance of responsibility by the defendant—provide a legitimate reason for leniency that is not present in the case of a defendant convicted after trial. *Brady v. United States*, 397 U.S. 742, 752, 90 S. Ct. 1463, 25 L.Ed.2d 747 (1970); *United States v. McQuay*, 7 F.3d 800, 802–03 (8th Cir. 1993).

*United States v. Fry*, 792 F.3d 884, 890 (8th Cir. 2015); *see also United States v. Mena-Robles*, 4 F.3d 1026, 1037 (1st Cir. 1993) (rejecting the defendant's argument that a presumption of vindictiveness applies "based solely on the fact that only these appellants exercised their right to trial, and they alone received the sentencing enhancement, although those codefendants who pled guilty to the conspiracy charge were situated similarly with respect to the firearm at issue").

We need not decide at this time whether a presumption of vindictiveness applies where a defendant who goes to trial receives a greater sentence than similarly situated co-defendants who pled guilty because Reynolds was not "similarly situated" to his co-defendants. *Fry*, 792 F.3d at 890. Each of Reynolds's co-defendants pled guilty only to certain counts of the indictment, while Reynolds was convicted on all fourteen counts. In addition, several of Reynolds's co-defendants cooperated with the FBI investigation or had other mitigating circumstances that affected their sentencing. As a result of this and other factors, each of Reynolds's co-defendants' Guidelines ranges were much lower than Reynolds's advisory range. Chuck Rizzo—who was perhaps the most culpable of Reynolds's co-defendants—received a sentence of 66 months of imprisonment,

but his recommended sentence was only 120 months.  Therefore, any disparity between Reynolds's sentence and his co-defendants' sentences does not warrant a presumption of vindictiveness.

Where the presumption of vindictiveness does not apply, "a defendant may still prevail by showing actual vindictiveness on the part of the sentencing authority." *Jackson*, 181 F.3d at 744 (citing *Wasman v. United States*, 468 U.S. 559, 569 (1984)).  Reynolds argues that the district court's explanation for Reynolds's sentence shows actual vindictiveness.  Reynolds points to the district court's explanation that it found Reynolds's behavior to be "astoundingly remorseless" and that Reynolds exhibited a "nearly astounding level of denial."  Appellant's Br. at 43-44; R. 285, PID 4011, 4013.  Reynolds interprets these comments as showing the district court's intent to punish Reynolds for denying his guilt and proceeding to trial.

The transcript, as a whole, does not support Reynolds's reading.  Rather, the district court was explaining its impression of Reynolds after listening to the evidence presented against him.  The district court made clear that its reference to the "astounding level of denial" was "in the psychological sense, not in the legal pleading sense," which led the district court to believe that Reynolds had "somehow persuaded himself that he didn't do anything wrong."  R. 285, PID 4013.  The district court thus concluded that "a very substantial sentence is appropriate," although still lower than what the Guidelines called for, in part to afford adequate deterrence to Reynolds's criminal conduct.  *Id.* at PID 4014-15.  When Reynolds objected that the district court based its sentence in part on Reynolds's lack of remorse, which would violate his right to remain silent and to a jury trial, the district court clarified that it was remarking on Reynolds's own words in recorded jail calls and other evidence about what he said and did during and after the commission of the crimes, rather than Reynolds's choice to go to trial.

With no indication that the district court was punishing Reynolds with a more severe sentence for exercising his constitutional rights, the district court's discussion of Reynolds's lack of remorse does not establish vindictiveness. "It is well established that a defendant's remorse—or lack thereof—is an appropriate consideration in meting out punishment." *In re Cook*, 551 F.3d 542, 551 (6th Cir. 2009). "Accordingly, it was not [Reynolds]'s exercise of his right to [a jury trial], but rather, that he did not accept responsibility for his crime, that the district court took into account in considering the § 3553(a) factors. This was not error." *United States v. Daneshvar*, 925 F.3d 766, 789 (6th Cir. 2019) (second alteration in original) (internal quotation marks and citation omitted).

## V.

For the reasons set out above, we affirm the district court's judgment.